Submit order on notice.

Norman **MAILER**, Plaintiff,

v.

**RKO TELERADIO PICTURES, INC.** and Warner Bros. Pictures, Inc., Defendants.

**Civ. A. No. 134–176.**

United States District Court
S. D. New York.

Jan. 10, 1963.

Rembar & Zolotar, New York City, George Zolotar, New York City, of counsel, for plaintiff.

Regan, Goldfarb, Powell & Quinn, New York City, Sidney P. Howell, Jr., Edwin E. McAmis, New York City, of counsel, for defendant RKO Teleradio Pictures, Inc.

Joseph D. Karp, New York City, for defendant Warner Bros. Pictures, Inc.

DAWSON, District Judge.

This action arises under the Copyright Laws of the United States, 17 U.S.C. § 101. At the time of the commencement of the action plaintiff was a citizen of Connecticut. The defendants are incorporated under the laws of Delaware. The requisite amount is in controversy so the Court has jurisdiction both under the copyright laws and by reason of diversity of citizenship.

A pre-trial order was entered on December 28, 1961. Certain facts were stipulated. Other facts were developed at the trial of the action.

The Court finds the following facts:

Plaintiff, who prior to May 6, 1948 was and ever since has been a citizen of the United States, was the author of the novel "The Naked and the Dead" (hereinafter referred to as "the novel"). In accordance with the copyright laws and regulations, plaintiff received exclusive rights and privileges in the novel and secured from the Registrar of Copyrights a certificate of copyright registration applicable to the novel.

The novel met with considerable success. Sales in the United States and Canada totaled more than two million copies as of June 1958 when this suit was instituted. Foreign sales were extensive and were in excess of one million copies.

Beginning about 1954, plaintiff conducted negotiations looking toward production of a motion picture based upon the novel. After various unsuccessful attempts, a written agreement was entered into by the plaintiff, dated October 14, 1954, with Gregory-Goldman Pictures (now known as Gregjac Pictures) for the production of a motion picture based upon the novel. The respective parties were represented by counsel well versed in the motion picture business in connection with the drafting of the agreement.

Gregory-Goldman Pictures assigned its rights under the agreement to RKO Teleradio Pictures, Inc. (hereinafter referred to as "RKO") by written agreements dated October, 1956. RKO then entered into a written agreement, dated October 18, 1957, with Warner Bros. Pictures, Inc. (hereinafter referred to as "Warner") for distribution of the photoplay. Under agreements between defendants RKO and Warner, RKO has agreed to indemnify Warner in the event any money judgment against Warner is awarded in this action.

The agreement between plaintiff and RKO provided that the plaintiff was to receive $100,000 and approximately 12½% of any profits which might be realized from the picture. The agreement contained a reversionary clause which is the subject of this action and which reads as follows:

"Anything herein contained to the contrary notwithstanding, if the production of a feature length photoplay is not completed pursuant hereto within three (3) years and six (6) months from the date hereof, all rights transferred and assigned hereunder shall automatically revert to the Owner. * * * No such reversion or release shall require the Owner to return any part of the sum to be paid the Owner pursuant to Article 10 hereof, and the purchaser shall be free of any further liability."

Since the agreement was dated October 14, 1954 the critical date for the production of the completed feature length photoplay, under this agreement, was April 14, 1958.

On April 23, 1958 plaintiff gave written notice to the defendants of his claim that production of the completed photoplay of feature length based upon his novel had not been completed by April 14, 1958 and that he claimed a reversion of all the rights. Nevertheless the defendants continued to distribute the picture.

The primary issues, as defined by the pre-trial order, are as follows:

"(a) Whether, within the meaning of the Agreement of October 14, 1954, production of a feature-length photoplay based upon the Novel was completed within three years and six months from the date thereof.

"(b) Whether rights under the Agreement have reverted to plaintiff.

"(c) What are the steps which enter into the production of a motion picture and which must be concluded before the production of a motion picture is completed? What is the trade usage of the term 'completion of production' ?

"(d) What work was performed on the photoplay before and after April 13 or 14, 1958?

"(e) Upon the entire record would the relief which plaintiff seeks effect a forfeiture cognizable as such either by California law or by a court of equity?"

The steps taken by RKO to comply with the contract were essentially as follows:

It first assigned a group of writers to deliver a screen play. This screen play was produced in acceptable form by June, 1957. The screen play was then

taken to the Production Department and divided into scenes and arrangements made for the cast, location, shooting of the film and any special arrangements which might be needed. By October 1957 most of this pre-production work had been completed. During the summer of 1957 the production crew was assembled. A final budget was prepared and approved on December 9, 1957. The estimated amount of the budget was $1,983,750. By this date Panama had been selected as the location for exterior shots and the cast was on location on that date.

The actual start of filming in Panama began on December 12, 1957. The production crew returned from Panama early in 1958 and began additional filming at the Warner lot in California. Filming at this lot lasted about a month.

Principal photography was completed on February 10, 1958. A few retakes were taken after that date, particularly on March 14 and 27, 1958.

The film was shown on March 14, 1958 to the Motion Picture Association of America, Inc. (hereinafter "MPAA") to get a certificate of approval. Certain suggestions for changes were made; one scene, involving a dance, was thought to be objectionable and two other scenes that were thought to be particularly brutal were objected to. These were the scenes that were redone on March 14th and 27th, 1958. The MPAA seal of approval was given on April 1, 1958 after the retakes were viewed and approved. By this time all editing had been completed; all photography had been completed. The schedule of production shows that the "1st complete re-recording was started April 2, 1958 and completed April 14, 1958." (Plaintiff's Ex. 45.)

On March 20 and 24, 1958, the executives of major theater chains were shown the movie to convince them it should be booked by their chains. The film shown to the theater executives was the same as that shown to the MPAA, except for the scene that was redone on March 27, 1958. By April 14, 1958, therefore, the defendants had a motion picture which had received the MPAA seal of approval and which had been shown to theater executives to secure bookings at various theater chains.

The first showing of the film to the public was on April 17, 1958 at the Fox Riverside Theater in Riverside, California. This was described in the testimony as a "sneak preview." A representative of plaintiff was invited to be present at this showing. A sneak preview occurs when a film is shown to the general public without advance notice and is for the purpose of judging audience reaction. The picture shown to the public on April 17, 1958 was the same one which had been completed by April 14, 1958. On April 15, 1958 this picture had also been shown at the Warner Studio, with various executives in attendance.

Warner, under the contract above mentioned, was to be in charge of distribution within the United States. On March 7, 1958 Warner and RKO had agreed upon a release date to the public which was set for August 9, 1958. On this date it was released nationally by Warner. It was shown at the Capitol Theater in New York and thereafter throughout the United States. There was no delay in the timetable for distribution. The movie was released on schedule. It was shown in many theaters and plaintiff has been entitled to receive his share of the profits therefrom. The picture was not a great financial success considering its cost of production. It had cost $1,845,379 to produce of which $1,827,106 had been incurred or expended by the defendant as of the week ending April 12, 1958.

The issue in the case has been stated to be whether there was a completed motion picture on April 14, 1958. The only changes made in the picture after that date were as follows:

(1) The background music used at the sneak preview and the showings before April 14, 1958 was different from the background music used in the final version released to the public in August 1958. The sound track of a movie con-

sists of many parts, including music, dialogue and special effects. The musical score for background music is necessarily one of the final items to be completed, since the composer requires a finished production in order to time the length of each scene and compose music appropriate to it. When the component parts of the sound track are completed and approved they are merged into a single sound track. This is done by a recording engineer and is essentially a technical process.

█ The sound track that the public heard at the sneak preview and which had been heard prior to April 14, 1958, was not identical with that which was released in August in the theaters. The preview production and the prior showings contained what is known as stock music. This is background music which is not written especially for a particular movie. It is one of several compositions in the studio library that can be used for a motion picture with which the studio is connected. In February, 1958, defendant RKO had entered into a contract with one Bernard Herrmann to compose the music for this particular picture. At that time, and for some time prior thereto, there had been a labor dispute between the American Federation of Musicians and the major motion picture producers. Herrmann composed the music but, in view of the labor dispute, could not get musicians to play it at a recording session. It was for this reason that stock music was used in the sneak preview and in the showings prior to April 14, 1958. RKO necessarily was interested in having the best possible musical accompaniment for the film and therefore negotiated an interim agreement on April 8, 1958 with the American Federation of Musicians allowing a recording of the score. The score was delivered by Herrmann on May 7, 1958. This score was integrated with the film of the picture. The final re-recording to coordinate the special music with the film was completed on May 22, 1958.

(2) Certain other changes were made by RKO after April 14, 1958, in an attempt to make the film more acceptable to the public. The Legion of Decency suggested that two lines in the final scene be revised. One was to change the word "God" to "God-like" and the other one was to change the line "Man shall not endeavor to achieve God" to "Man shall not endeavor to achieve the power of God." As an accommodation to the Legion of Decency these changes were made. It was not necessary to expose any additional film in order to make these changes because the camera was not on the speaker for these two lines. The lines were merely recorded in a sound studio and substituted for the originals.

(3) Also, after the sneak preview, above five minutes of film was cut from the picture. This related particularly to a dance which might have been considered objectionable. Some additional footage was cut in an attempt to intensify dramatic impact. All these changes were minor and were made in an attempt to improve the film which had been made prior to April 14, 1958.

(4) Original filming of the picture had taken place in Panama with the assistance of the Department of Defense. RKO had hoped to have a credit line stating that the picture had been made in cooperation with the Department of the Army. Before the Pentagon would give such approval there had to be a screening of the film to see that there was nothing in it which the Defense Department would consider offensive. This screening, which was held on April 28, 1958, resulted in several suggestions from the Army. These were seriously considered by the studio and then turned down. The Department of Defense then asked that any reference to the cooperation of the Army in the making of the film be deleted from the credits, and this was done.

The above changes represent all that was done after April 14, 1958. That is, music composed by Herrmann was substituted for stock music, two lines of dialogue were altered, five minutes of film was deleted and a credit acknowledging the cooperation of the United States Army was removed. All of these changes

improved the picture for a public showing and for acceptance by the public. Were these changes sufficient to conclude that on April 14, 1958 RKO did not have a completed motion picture? This is the essential issue in the case.

### Discussion

The first question which the Court must consider is what is meant by a "completed motion picture." Counsel have been unable to furnish the Court with any decision which interprets this phrase. Therefore it became necessary to take testimony on the subject.

Three experts called by the defendants testified that production of a motion picture is generally deemed complete within the motion picture industry upon completion of "principal photography." This hardly seems to be a proper definition of the term. A completed motion picture is more than the completion of the filming of the scenes. When the principal photography is completed a considerable job of editing remains to be done before the picture can be exhibited. Mr. Perlman, a witness for the plaintiff, testified, for example, that on the picture "The Goddess" roughly 100,000 feet of negative was exposed but the completed picture, after editing, had something around 7,500 feet.

Mr. Gregory, the principal in Gregory-Goldman Pictures, Inc., was asked by the Court for his understanding of the term "completed motion picture" and his reply was "when major photography is done and the editing and all that goes with that is completed." (S.M. 342.)

This seems to the Court to be a good definition of this term. In other words, a completed motion picture is a picture ready to be processed for distribution to exhibitors. The photography has been completed, the editing has been done and the picture awaits only those technical steps which may be necessary to put it in distribution. This is the obvious common-sense meaning of the term and seems to accord with the understanding of the persons entering into the contract.

This construction of the phrase is supported by the reason for the insertion of the reversionary clause, embodying this phrase, in the agreement. When the plaintiff was asked why he wished a reversionary clause giving him this reversion in the event that a completed motion picture was not produced within three and one-half years from the date of the agreement, he answered that he had asked his attorney "to secure for me some sort of guarantee that the book would not just be put on the shelf forever." (S.M. 34.) The author in this case was granting a license to a motion picture producer to produce the picture. If the motion picture producer put the novel "on the shelf" the author would have been deprived of the opportunity to get revenue from the picture and at the same time prevented from making arrangements with another motion picture producer for production of a motion picture. He obviously wished a motion picture to be produced. The point at which the motion picture was produced would obviously be the one at which the company had made a motion picture available to be put into distribution and had, thereby, invested such a large sum of money in it that it would be to the producer's advantage to distribute the picture.

Now, applying this definition of the phrase to the facts in this case, was there a motion picture produced by the cut-off date? The defendants had a completed motion picture in the sense that all the photography and editing had been completed; a musical score had been affixed and the necessary certificate from the MPAA had been obtained. Within three days after the cut-off date the picture was exhibited in a public showing in California. The defendants had expended almost $2,000,000 in this production. The public distribution began shortly thereafter on the scheduled date; the picture was exhibited nationwide in August 1958, and plaintiff began receiving his percentage of profits therefrom.

Boiled down to its essentials, the plaintiff is contending that certain changes and alterations were made in the picture after the cut-off date, rather than that a completed motion picture was not produced by that date. The defendants were as much interested as plaintiff in having a successful motion picture. After the motion picture had been completed and exhibited, the changes hereinbefore referred to were made. Specially written music was added to the final score; certain deletions were made, which the defendants thought would improve the public acceptability of the picture. These facts did not show that the picture had not been completed by the cut-off date. A picture may be completed by a certain date and improved thereafter without it necessarily following that the picture was not complete at the date set.

A simple example might possibly make this clearer: Let us assume a contract between a contractor and a developer, under which the contractor agrees to complete a house by a certain date for the developer. A house is completed. It is a livable house. The developer, however, suggests to the contractor that the house might be more readily saleable if the bedroom is painted a different color or some additional lighting fixtures installed. The contractor, who is equally interested in seeing that the house becomes saleable, makes these changes in the house. Can it be contended that the house was not completed at the date set simply because those improvements were thereafter made? It would seem not.

It seems to be the contention of the plaintiff that the motion picture was not completed until the prints were made for final distribution to the exhibitors. This, of course, is not correct. The motion picture was completed; the prints were made mechanically for distribution thereafter. The picture was shown in California; it could have been shown in other places. But to get as great distribution as possible it was necessary to make a large number of prints for the theaters at which it would be exhibited. The making of the prints does not mark the termination of production of the picture. If this were so many pictures would never be deemed completed, because prints are frequently made long after the first exhibition of the picture.

It may be pointed out, in passing, that plaintiff has taken a rather technical stand in this case. He contracted for the defendant to produce a motion picture so that he could share in the profits therefrom. The motion picture was produced at considerable expense by the defendant. It was exhibited nationwide and he shared in the profits therefrom. Because certain changes were made after April 14, 1958 plaintiff now wishes the defendant's investment in this picture to be entirely scrapped and to secure for himself the right to renegotiate with somebody else for production of a motion picture. The changes which were made were made for his benefit, as well as for the benefit of the producer of the picture. They do not alter the fact that at the cut-off date there was a completed motion picture in existence.

### Conclusion

The Court concludes that within the meaning of the agreement of October 14, 1954, production of a feature length photoplay based upon the novel was completed within three years and six months from the date thereof, and that the rights under the agreement have not reverted to the plaintiff.

The Court concludes that judgment shall be entered for the defendants, together with their costs, disbursements and counsel fees. Counsel fees to which the defendants may be entitled under Section 116 of Title 17, U.S.C., shall be determined upon subsequent application to, and hearing by, the Court.

Let judgment be entered accordingly.

This opinion shall constitute the findings of fact and conclusions of law of the Court.