**Norman MAILER, Plaintiff-Appellant,**

**v.**

**RKO TELERADIO PICTURES, INC.,
and Warner Bros. Pictures, Inc.,
Defendants-Appellees.**

**No. 411, Docket 28217.**

United States Court of Appeals
Second Circuit.

Argued April 10, 1964.

Decided May 8, 1964.

George Zolotar, of Rembar & Zolotar, New York City, for plaintiff-appellant.

Sidney P. Howell, Jr., of Regan, Goldfarb, Powell & Quinn, New York City (Edwin E. McAmis and Harry W. Jacobs, New York City, on the brief), for

defendant-appellee RKO Teleradio Pictures, Inc.

Joseph D. Karp, New York City, for defendant-appellee Warner Bros. Pictures, Inc.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

By the terms of an agreement dated October 14, 1954, Norman Mailer assigned the motion picture rights to his novel, "The Naked and the Dead," to defendants' predecessor, with the proviso that "if the production of a feature length photoplay is not completed pursuant hereto within three years and six months from the date hereof all rights transferred and assigned hereunder shall automatically revert to" Mailer. Mailer now contends that "production of a feature length photoplay" was not completed by the cut-off date, that all rights consequently reverted to him, and that the defendants' continued production and distribution of the motion picture version of "The Naked and the Dead" thus constituted an infringement of copyright. In a well-reasoned opinion below, Judge Dawson concluded that a "feature length photoplay" had been completed within the time specified, and accordingly rendered judgment for the defendants. 213 F.Supp. 294 (S.D.N.Y.1963).

In finding the solution to the question posed we must examine the state of completion of the photoplay on April 14, 1958, the crucial date for the operation of the reversionary clause. By that date principal photography on the picture had long been completed; the film had been shown to the Motion Picture Association of America, and, after several retakes, had won that organization's certificate of approval; it had been exhibited to executives of major theater chains in an effort to obtain bookings; and some 98% of RKO's production budget, amounting to almost two million dollars, had already been expended on the project. Three days after the cut-off date, moreover, the film was shown to the public in a sneak preview at Riverside, California, and, pursuant to a timetable set on March 7, the picture was released nationally on August 9, 1958.

As Mailer strenuously insists, certain changes were made after April 14. Original background music was added to the sound track, two lines in the picture's final scene were altered to conform to a request of the Legion of Decency, some 500 feet of film, amounting to approximately five minutes of running time, were trimmed to intensify dramatic impact, and a credit line, acknowledging the co-operation of the Department of the Army, was deleted. Like Judge Dawson, however, we are unable to conclude that these minor changes—even though undertaken after the cut-off date—were sufficient to cause all rights to revert to Mailer.

When viewed in the context of the contract as a whole, it is clear that the reversionary clause was not intended to exact so arbitrary and Draconian a penalty. Thus, the assignment agreement called for Mailer to receive a lump-sum payment of $100,000, plus approximately 12½% of the profits of the picture. As a means of protecting Mailer in this profit-participation arrangement, the reversionary clause was designed to ensure that the producer would not subsequently decide to abandon the proposed film, or "pigeon-hole" the book—a not uncommon occurrence in the motion picture industry—and hence deprive Mailer of both his expected share of the proceeds and the satisfaction which may come to an author upon seeing his work take life on the screen. If, pursuant to the clause, a picture was not in fact completed as intended by the parties within the time specified, Mailer would, quite properly, then be free to make other arrangements and hence to realize his objectives.

Seen in this light, which we believe places the true purpose of the disputed provision in its proper focus, the clause had clearly fulfilled its objective at the time the cut-off date was reached. RKO had already spent some $1,827,106 on

the picture, a firm release date had been set, and only relatively insignificant alterations had yet to be completed. To hold that, under these circumstances, Mailer might wield the reversionary clause as a club, and compel the defendants to pay a greater amount for the picture rights than the parties had contemplated, would be tantamount to transforming an entirely reasonable contractual provision into a mechanism for a harsh and unreasonable forfeiture of the worst order.

■ Courts have long insisted that contracts may not be interpreted in this manner—so as to frustrate and distort the intentions of the parties. Arnold Productions, Inc. v. Favorite Films Corp., 298 F.2d 540 (2d Cir. 1962); City of Harlan v. Duncan Parking Meter Corp., 231 F.2d 840 (8th Cir. 1956); United States v. Morrell, 204 F.2d 490, 36 A.L. R.2d 1374 (4th Cir.), cert. denied, 346 U.S. 875, 74 S.Ct. 128, 98 L.Ed. 383 (1953); Wier v. Texas Co., 180 F.2d 465 (5th Cir. 1950). In Corbin's often-quoted language, a "word, appearing suddenly, in empty space and with no history, would express nothing at all. To be expressive of any meaning, all words must have a context and a history * * *." 3 Corbin, Contracts 90 (1960). So it is that here, we must look to the intended significance of the disputed clause, and not attempt a woodenly technical parsing of language to create a meaning wholly at variance from that which the parties plainly intended.

From the evidence of negotiations which led to the assignment agreement and the extensive expert testimony which illuminated the significance of "completion of a photoplay," the District Court was able to determine what the parties did intend. As we have already indicated, they sought to protect Mailer from a belated decision to scrap the picture; they did not contemplate that, after the picture was for all practical purposes completed, Mailer would seek to "eat his cake and have it too." We have no warrant for overturning these essentially factual determinations on appeal.

■■ The remaining subjects of this appeal, stemming from Mailer's challenge of several items allowed to the defendants as costs below, may be disposed of briefly. Thus, Mailer contends that Judge Dawson erred in allowing the sum of $118.50, incurred by the defendants in taking Mailer's deposition. While the deposition was not read at trial, its allowance as costs was plainly a matter for the discretion of the District Court, and may not be disturbed on appeal. 6 Moore, Federal Practice ¶ 54.77. Similarly, the challenged items of $518.88 and $482.88, representing the cost of bringing two witnesses from California, may not be set aside; Judge Dawson found the testimony of both to be helpful and relevant, and his judgment in this regard is controlling. Farmer v. Arabian American Oil Co., 324 F.2d 359 (2d Cir. 1963), cert. granted, 84 S.Ct. 799 (1964).

■ Finally, Mailer objects to the allowance of $5,000 as counsel fees, pursuant to 17 U.S.C. § 116, which permits a discretionary award to the prevailing party in copyright actions. While noting that Mailer's claim was neither "synthetic" nor "capricious," Judge Dawson concluded that it was "unreasonable." In his words, Mailer "had a legal argument. Whether he had an argument which was good as a matter of conscience is open to more doubt."

We entirely agree. As Judge Dawson made clear, "this was not a case of piracy of a literary work, or the unqualified refusal to recognize the validity of a copyright," but rather represented an attempt by Mailer to employ a highly technical argument as a means of extracting a grossly unfair penalty assessment from the defendants. After examining the record in this proceeding, we find the inference inescapable that Mailer, disappointed in the failure of the film to return the expected profits, merely sought to recover those profits in the form of a judgment or, more likely, a substantial settlement. Although suffering no injury whatsoever from the little work done after April 14, 1958, Mailer attempted to seize upon the reversionary clause as

**750**

a means of forcing the defendants to choose between jettisoning a two million dollar investment, or paying him whatever whimsy told him to demand. This sort of litigiousness cannot be condoned. Under the circumstances, the moderate counsel fee awarded was entirely proper.

The judgment is affirmed.

J. JOSEPH SMITH, Circuit Judge (concurring in part and dissenting in part):

I concur in the affirmance of the dismissal of the complaint and in Judge Kaufman's able discussion on the merits. On the travel costs I agree that Farmer requires affirmance. I would not, however, allow counsel fees under the circumstances here and therefore dissent from the affirmance of the award of counsel fees.