**Lawrence HUMPHREY, Plaintiff,**

v.

**COLUMBIA RECORDS, A DIVISION OF CBS, INC., DEF Jam Recordings, Inc., DEF Jam Publishing, Rush Productions, Russell Simmons, Rick Rubin, and James Todd Smith, Defendants.**

**No. 86 Civ. 6667 (RLC).**

United States District Court, S.D. New York.

March 17, 1989.

Janice Noble and Andrew Feinman, William Krasilovsky, Feinman & Krasilovsky, Milgrim Thomajan & Lee, P.C., New York City, for defendants Def Jam Recordings, Inc., Def Jam Music, Inc., Rush Productions, Inc., Rick Rubin and Russell Simmons; Charles B. Ortner, of counsel.

Barbara Mentz, New York City, for CBS, Inc.

Giaimo Vreeburg & Rosen, Forest Hills, for James Todd Smith; Joseph O. Giaimo, of counsel.

ROBERT L. CARTER, District Judge.

**I**

Almost from its inception, this litigation has been marked by an astonishing amount of vitriol and vituperation, barely kept in check in the court's presence. The case proceeded to trial on September 27, 1987. On September 29, 1987, the court dismissed the action in an opinion from the bench which described the litigation as "outrageous" and "unwarranted." Not surprisingly, defendants, invoking the inherent power of the court, Rule 11, F.R.Civ.P., 28 U.S.C. § 1927, and 17 U.S.C. § 505, have now moved for award of costs and attorney's fees to be assessed against plaintiff and his counsel as sanctions for their vexatious conduct and bad faith in conducting and pursuing this meritless litigation.

Initially defendants moved for sanctions against all of plaintiff's counsel, Andrew Feinman, Esq., William Krasilovsky, Esq. and Janice Noble, Esq., but they later reached a settlement with Feinman and Krasilovsky. Pursuant to the settlement, Feinman and Krasilovsky agreed to pay defendants $30,000 immediately plus another $15,000 over time. Defendants reached no accord with plaintiff's third counsel, Ms. Noble, and continue to seek sanctions against her.

This litigation was instituted to secure compensatory and punitive damages as well as equitable relief for copyright infringement, Lanham Act violations, unfair competition and conversion. Defendants counterclaimed under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* Plaintiff alleged that prior to December, 1984, he wrote the lyrics of some ten songs, and referred to himself as L.L. Cool J, and that in the fall of 1984, Def Jam Recordings released a phonograph recording containing these lyrics and plaintiff's name L.L. Cool J. Subsequently in the spring of 1985, Def Jam Recordings issued a commercial phonograph recording containing the lyrics of five of these songs and the name L.L. Cool J. In October, 1985, CBS issued a commercial phonograph record containing all of his lyrics and the name L.L. Cool J. Moreover, plaintiff alleges that the voice on the recordings was plaintiff's voice and not that of defendant James Todd Smith.

**II**

Defendants base their motion for sanctions against plaintiff and Noble, his chief counsel, on the following claims:

That this suit was based upon a bogus basement tape which plaintiff claimed to have recorded in 1983, and that even before defendants took the deposition of TDK Magnetic Tape Corp., plaintiff and his counsel knew that the tape had been manufactured on October 7, 1985, and that plaintiff's claim of having recorded it at an earlier date was false.

That Noble made repeated *ex parte* communications with the court, leading the

court to believe that defendants had been properly served with these communications, when in fact they had not been. This resulted in temporary, unwarranted relief being accorded to plaintiff, requiring defendants to expend funds and time and effort setting the record straight and otherwise frustrating the ability of defendants to make orderly preparations to bring the matter to trial.

That plaintiff secured an order from the court requiring them to secure voice exemplars of defendant Smith on the representation that the exemplars were vital despite defendants' urging alternative and less expensive procedures. After defendants had expended thousands of dollars in securing these exemplars, plaintiff refused to have his expert conduct tests of them until the evening before the second day of trial, and the expert was never called to testify.

That plaintiff's counsel refused to accept the invitation of defendants to visit defendant Smith's basement which would have revealed conclusively that plaintiff had never been in Smith's basement and that the basement tape was a fabrication.

That plaintiff's counsel made continual motions and applications charging fraud and misconduct by defendants which required defendants to expend time, energy and resources in rebuttal, when counsel knew there was nothing to support these allegations.

That counsel sought to delay and obstruct discovery of her expert to avoid the unveiling of the expert as unqualified, the exposure of his findings as based on insufficient samples and the revelation that his equipment was obsolete.

That Noble knew early on from Board of Education records that Smith and plaintiff had not attended fourth grade together. Despite this knowledge, she elicited perjured testimony from her client concerning this matter at trial.

That counsel pursued the allegation that Smith had observed plaintiff rehearsing, although plaintiff testified that he told Noble that this allegation was false before the trial began.

Noble required defendants to track down various non-party witnesses of material events, distributors and recording engineers, and prepare the pressing plant used by Def Jam Recordings and the mastering laboratory for the making of exemplars which were never used; to designate, copy and organize thousands of pages of documents; and retain costly expert witnesses, simply because plaintiff's counsel refused to stipulate to verifiable and documented facts which required defendants to be prepared to meet contentions asserted by plaintiff even though counsel had no credible or reliable evidence to support her contentions, and because plaintiff deliberately sought to make trial preparation for defendants as costly as possible.

That plaintiff's counsel repeatedly made material representations in correspondence, in court conferences, at depositions and at trial, which lacked foundation.

Noble contends that sanctions are inappropriate because she engaged in extensive pre-filing investigation before filing the complaint, and was privy to no facts or law from filing to trial to indicate that the case was without merit. Indeed, because CBS made no pre-filing refutation of plaintiff's expert finding that the voice on the "Radio" album was plaintiff's, she charges that CBS was responsible for the commencement of the litigation. Moreover, it is argued that Noble's financial resources are so meager as not to warrant sanctions, and the settlement reached with her co-counsel should be more than sufficient to cover any punitive financial liability owed defendants. Indeed, Noble contends she is in effect inexperienced. Her co-counsel are experienced lawyers, and if anything is amiss they should bear a major share of the responsibility.

III

*Determination*

■ This case provides a classic example of the rationale which may be utilized to impose sanctions on an attorney under the court's inherent power, Rule 11, § 1927 or § 505. This is a case in which counsel had to have proceeded "in bad faith, vexatious-

ly, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). There is simply no other credible explanation for this meritless case proceeding as far as it did. In such exceptional circumstances, the so-called "American rule" that the successful litigant bear its own expenses loses its force.

Plaintiff, a nineteen-year-old youngster, apparently approached Noble claiming that a CBS album "Radio" contained music and lyrics which had been purloined from him. He claimed that he was in fact L.L. Cool J., the purported artist in the album; that James Todd Smith, whom defendants were promoting as L.L. Cool J., had been a classmate of his in grammar school; that he had written the lyrics and made a recording in Smith's basement, which CBS had reproduced as its Radio album. Noble secured the services of Feinman and Krasilovsky as co-counsel. However, Feinman and Krasilovsky made few personal appearances in the case during the pretrial stages of this litigation. Their roles at all times in the court's presence was merely supportive of Noble. They never took charge. There was never any doubt in my mind that Noble was lead counsel and in control. I viewed her more experienced co-counsel's presence as resource for assistance and advise.

Noble had the Board of Education records early on which showed that Humphrey had never attended school with Smith. This was not necessarily fatal. The fact that they were not classmates was not enough to undermine the whole story, but it was a warning signal. Noble not only ignored that signal, but proceeded to elicit at trial testimony from Humphrey that he and Smith were classmates. When she elicited that information, she knew it was false. More devastating, she knew when she asked the question that she was inducing her client to give perjured testimony. That alone is a sufficient basis for an award of sanctions under the court's inherent power, *see Alyeska Pipeline*, 421 U.S. at 258–59, 95 S.Ct. at 1622, or under § 1927.

She secured the services of a so-called expert, who supposedly advised that the voice on the "Radio" album was Humphrey's, but she never called her expert to testify at trial. Defendants contend that he was not a qualified expert in the field, that his equipment was obsolete, and the sample he used was inadequate. The court is in no position to deal with those issues. Yet, after advising the court of what her expert had found, securing the court's determination to protect the integrity of any tests he might make, insisting that voice exemplars be taken of Smith, for the apparent purpose of permitting her expert to test them, Owen made no such tests until the trial was underway, did not testify at trial and, as far as I can ascertain, made no use of the exemplars. Thus, defendants were required to expend needless sums of money at Noble's insistence. Such conduct lacked justification and evidenced a conscious and malicious determination to make her opponents' defense as costly as possible.

Then there is the so-called basement tape. Noble now asserts that defendants were placing emphasis on that tape, but that was not my impression. Until defendants brought out that the tape was a fraud and of recent origin, Noble had placed emphasis on the tape, to the extent of expressing great concern to the court in allowing defendants access to it for discovery purposes for fear that they might tamper with it. Indeed, time was spent in court conferences in putting procedures in place for defendants' handling of the tape to be certain that defendants in being allowed access to the tape would not be able to alter it.

Defendants' offer for plaintiff to visit the Smith home was never accepted. The reason Noble now gives is that the offer was subject to the condition that if the home differed materially from plaintiff Humphrey's descriptions, the lawsuit would be withdrawn. That excuse is not persuasive. The parties sought conferences with the court whenever there was a controversy. Noble brought matters of far

less moment to the court than her claim that she could only be given access to Smith's basement to view the premises if she agreed to drop the litigation; she could very readily have taken this matter up with the court. Smith could limit plaintiff's access to his home, of course, but since defendants planned to make a video tape of the house, showing the entrance to the basement, plaintiff would clearly have been entitled to visit the house for discovery purposes. Indeed, since the Smith home layout was always a potential issue in the case, plaintiff was entitled to have access to it for discovery purposes in any event. While access would not have been allowed until defendants had the opportunity to memorialize Humphrey's testimony in that regard, the house could have been visited without condition. Her refusal to visit the Smith home amounted to foregoing an opportunity to learn that her client's representation about knowing Smith and making a tape in his basement was false. This was yet another opportunity missed to learn that the case was without merit and should have been withdrawn.

As the trial developed, it became clear the plaintiff had embarked on an excursion into fantasy. His very description of how he made the tape in Smith's basement rendered his whole story suspect. He could not describe what he did, what equipment he used, except in general terms. His testimony was little more than "I went to the basement and made the tape." That taping session which he claimed to have performed in 1983 or 1984 could not have been performed until after October 7, 1985, since the tape had not been manufactured until then. The manufacturer's name was on the tape. A simple inquiry could have elicited the information that Humphrey had not been truthful when he gave counsel an earlier date. It would then have been clear enough that plaintiff had no claim. Smith's recording of "I Need a Beat", one of the songs on the "Radio" album, was made and shipped to distributors in the fall of 1984. Two other songs were recorded and distributed in early 1985, and the entire "Radio" album was recorded in the summer and fall of 1985. A single record from the album was released by CBS for pro-

motional purposes on October 14, 1985, and for commercial sale on October 23, 1985. The entire "Radio" album was released for commercial sale by CBS on November 15, 1985. Thus, a tape manufactured in October, 1985 could not have taped a basement performance predating the defendants' recordings.

Noble could readily have ascertained these facts with a minimum of investigation. She was dealing with an adolescent with claims of artistic talent. She should have been on guard to investigate his story before proceeding. Faced with the motion for sanctions, Noble submits an affidavit by her expert Tom Owen which states that he made a spectrographic analysis of plaintiff's voice and made an analysis of the song "I Can't Live Without My Radio" as it appears in the commercially released "Radio" album and determined that Humphrey's voice appeared on the "Radio" album at least with regard to the song "I Can't Live Without My Radio." Aff. of Tom Owen at 3.

This submission is insufficient for any purpose. Noble had this expert from the outset, and in almost every conference with the court, the needs of her expert became a part of the discussion. She sought protection from his being deposed further. She sought a court order requiring defendants to pay him a fee for the time defendants took to complete his deposition. She insisted that he needed to have exemplars of Smith's voice. Yet, the trial proceeded and concluded without his being called. Defendants were apparently prepared to challenge his qualifications and to subject him to rigorous cross-examination if he had taken the witness stand. They questioned his methodology and the conclusions he reached. Absent cross-examination by defendants, I cannot properly or fairly evaluate his affidavit.

Noble has also filed the affidavits of one Ernst Alexanderson who, along with an associate, Linda Chiari, had been retained early on by CBS as voice identification experts. The latter were hired by CBS to provide it with voice identification analysis. CBS alleges that it did not know, and was

never advised, that these two experts had a relationship with Tom Owen, plaintiff's expert. CBS also alleges that Alexanderson and Chiari, unbeknownst to CBS, had contact with Owen. Without knowing whose voice it contained, CBS states, Chiari listened to an exemplar in CBS studios on July 31, 1986, and on August 13, 1986, informed CBS that both she and Alexanderson had concluded that the voice on the exemplar was not the voice on the "Radio" album. After getting that opinion, CBS advised Alexanderson that Owen had reached a different conclusion. On August 21, 1986, Alexanderson called CBS to state that his initial opinion was incorrect and that the exemplar was the voice on the "Radio" album. Reply Aff. of Barbara Mentz at 13–23.

CBS decided not to call Alexanderson or Chiari at trial. Noble sought a court order enabling her to take their depositions. The court barred the depositions, since CBS had stated that it would not use either as its expert witness. At the time, the court did not know that the two CBS experts had relationships with Owen. Nor did the court know that they discussed their assignment with Owen. Nor was the court aware of Alexanderson's and Chiari's change of opinion as to the dissimilarity of the voice on the basement tape and the voice on the "Radio" album on learning that Owen had reached the opposite conclusion.

CBS filed a motion on September 29, 1987, to quash any testimony of Alexanderson and Chiari, and to bar any attempt by plaintiff to use the testimony of these individuals which had been obtained in violation of the court's order of April 28, 1987, barring Noble from deposing any experts CBS did not plan to call. No action was taken on the motion, but Noble's attempt to use their affidavits in this proceeding is an attempt to evade the court's order and will not be permitted. They were engaged by CBS to give it professional advice for use in this litigation. Their dealings with Owen amounted to collusion and compromises both their integrity and professionalism. I am unwilling to accept any testimony from them absent it being subjected to cross-examination by CBS.

This case has been conducted throughout in a highly unprofessional manner by Noble. She made a habit of filing papers without serving them on opposing counsel, and calling chambers unilaterally without notice to opposing counsel. Initially, the court was not aware that letters sent to chambers had not been served on opposing counsel. Conferences would be called on Noble's request and begun with defendants being attacked for some wrong committed, but as the conference progressed, it would become clear that the court had been misled or the wrong complained of had been exaggerated. After a series of such instances, experience taught the court to refuse to consider matters raised by Noble without evidence that the opposing counsel had notice of the issue being raised.

Noble has handled this case unprofessionally both in practice and in principle. The unprofessionalism in practice has already been alluded to. This case had no sound factual or legal foundation and should not have been brought. Any casual investigation would have made clear that Humphrey was either deliberately lying or fantasizing. Moreover, Noble conducted the case in a mean spirited and uncooperative manner. She sought to make the defendants' conduct of the case as expensive as possible. While an attorney is not required to conserve his opponent's expenditures, he or she is at risk when the attorney deliberately causes an opponent to expend funds needlessly, as was done here.

As a copyright infringement action, defendants, as the prevailing parties, are entitled in the court's discretion, to an award of costs and attorney's fees as a penalty against plaintiff for instituting this frivolous litigation. *Jartech, Inc. v. Clancy,* 666 F.2d 403 (9th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982), *rehearing denied,* 459 U.S. 1059, 103 S.Ct. 477, 74 L.Ed.2d 624 (1982) *rehearing denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed. 2d 1453 (1983).

■ Title 17 U.S.C. § 505 provides that in a civil action "the court in its discretion may allow recovery of full costs by or against any party other than the United

States or an officer thereof. Except as otherwise provided by this title the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." Under prior copyright law, an award of full costs (other than attorney's fees) was mandatory. *Marks v. Leo Feist, Inc.*, 8 F.2d 460, 461 (2d Cir.1925); *United Telephone Co. v. Johnson Publishing Co.*, 855 F.2d 604, 612 (8th Cir.1988). Under the present statute both the award of costs, *International Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 384 (7th Cir.1988); *Whelan Associates, Inc. v. Jaslow Dental Laboratory*, 609 F.Supp. 1325, 1329 (E.D.Pa. 1985); 3 Nimmer on Copyright, § 14.09 (1988), and the award of attorney's fees, however, is within the court's discretion. *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 915 (D.Conn.1980); *Moorish Vanguard Concert v. Brown*, 498 F.Supp. 830, 831 (E.D.Pa.1980); *Warner Brothers, Inc. v. O'Keefe*, 468 F.Supp. 16, 19 (S.D. Iowa 1977). While such discretion to award attorney's fees may be exercised only as to a prevailing party, *Whelan Associates, Inc., supra* at 1325, a prevailing defendant may properly be denied an award of attorney's fees when plaintiff's claim is colorable. *Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984). *But see Cohen v. Virginia Electric & Power Co.*, 617 F.Supp. 619, 622 (E.D.Va.1985), *aff'd*, 788 F.2d 247 (4th Cir. 1986) ("nothing in the statute or legislative history [of the Copyright statute] gives to courts any authority to distinguish between an award of attorney's fees to a prevailing defendant and an award to a prevailing plaintiff"). Where plaintiff's claims, as here, lack merit, there is no impediment to a prevailing defendant recovering its reasonable attorney's fees. *Mailer v. RKO Teleradio Pictures, Inc.*, 332 F.2d 747 (2d Cir.1964), *cited with approval, Diamond v. Am–Law Publishing Corp., supra* at 148.

It appears, therefore, that the court may award full costs and reasonable attorney's fees to defendants pursuant to Title 17 U.S.C. § 505, that sanctions are mandated under Rule 11, F.R.Civ.P., *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985); and that sanctions may be imposed in the court's discretion as

an award of attorney's fees pursuant to 28 U.S.C. § 1927, as well as under the court's inherent power. *Alyeska Pipeline, supra.*

Defendants have documented the attorney's fees and expenses incurred in the litigation separately. Def Jam Recordings, Inc., Def Jam Publishing, Rush Productions, Inc., Russell Simmons, and Rick Rubin have detailed $242,235 in attorney's fees, plus $46,816.71 in disbursements. Aff. of Charles Ortner, dated October 20, 1987, at 59 *et seq.* In addition to the above expenses, it seeks an additional $14,662.58 in non-legal expenses. Aff. of Dawn Greco, dated October 20, 1987, at 2.

Defendant CBS has documented legal fees of $214,112.50, and expenses of $12,-944.48. Aff. of Barbara Mentz, dated October 22, 1987, at 19–21.

Defendant James Todd Smith has documented expenditures for legal fees of $160,475 and expenses of $27,535.52. Aff. of Joseph Giaimo, dated October 21, 1987, Ex. A.

This is a very difficult case, not because sanctions are not clearly warranted, but because plaintiff's counsel is, I believe, a lone practitioner and even if an award includes the plaintiff, the burden will be Noble's because plaintiff is virtually judgment proof. Moreover, a sizeable monetary award against plaintiff's counsel could have the result of effectively ending her practice in New York. Sanctions are not a substitute for disciplinary proceedings.

I have mulled over this opinion from time-to-time for about a year, hoping that time would show me a way out that was just but less harsh than what the defendants demand and the law countenances. Defendants are clearly entitled to judgment that will at least retrieve the wasteful and needless expenditures they were required to disburse because of Noble's mean spirited and uncompromising activities. Even while she was requiring defendants to run up these huge trial preparation expenditures, she had to know that she was pursuing a baseless cause. Def Jam Recordings, Inc., Def Jam Publishing, Rush Productions, Inc., Russell Simmons and Rick Rubin expended $61,479.29; defen-

dant CBS's costs are $12,944.48 and defendant James Todd Smith's costs are $27,535.52. I do not question the accuracy of the figures provided by defendants as to their expenditures. However, taking into account Noble's apparent limited financial resources, the $45,000 settlement defendants have obtained from Noble's co-counsel is to be setoff against the award of costs. While I have no knowledge concerning how defendants propose to divide among themselves the settlement from Feinman and Krasilovsky, I am allocating the settlement as a setoff among the defendants. In short, the award of costs pursuant to 17 U.S.C. § 505, and the settlement agreed upon adds up to the aggregate of all of defendants' legal costs.

Accordingly, judgment for costs of $36,479.29 is awarded against Noble in favor of Def Jam Recordings, Inc., Def Jam Publishing, Rush Productions, Inc., Russell Simmons and Rick Rubin. Judgment of costs of $7,944.48 is awarded defendant CBS against Noble. Judgment of $17,535.32 is awarded defendant James Todd Smith against Noble. That award is also sufficient to meet the mandatory requirements of sanctions under Rule 11, F.R. Civ.P., as well.

The court in the exercise of its discretion, while recognizing that an award of attorney's fees would ordinarily be appropriate, will not award attorney's fees as an additional sanction under Rule 11, F.R.Civ.P., 17 U.S.C. § 505, 28 U.S.C. § 1927, or the inherent power of the court.

IT IS SO ORDERED.