**WARNER BROS. INC., Plaintiff,**

v.

**DAE RIM TRADING, INC., and Yun Yon Cho, Defendants.**

**No. 84 Civ. 4675 (IBW).**

United States District Court, S.D. New York.

Jan. 21, 1988.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiff; J. Joseph Bainton, of counsel.

Curtis, Morris & Safford, P.C., New York City, for defendants; Pasquale A. Razzano, of counsel.

## OPINION, WITH FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND DECISION

WYATT, District Judge.

These are the findings of fact and conclusions of law (Fed.R.Civ.P. 52(a)) and the decision in this action tried without a jury. The action was commenced on July 2, 1984, with a simple one count complaint for copyright infringement in which jurisdiction was asserted solely on a federal question (28 U.S.C. § 1331), specifically federal copyright laws (28 U.S.C. § 1338(a)).

Any reason for the action as one to stop copyright infringement disappeared early in the litigation when, as will appear, the defendants in this action admitted infringement of the one copyright which they had in fact infringed. The action has for over three years been persistently and aggressively prosecuted, not to stop copyright infringement but, as admitted by plaintiff in its "Revised Proposed Finding of Facts and Conclusions of Law" filed July 20, 1987, p. 3; hereafter cited "P Brief," for a different reason: "The basic issue in these actions is who should bear the reasonable expenses of a copyright enforcement program—the copyright owner which has had its property infringed or the persons who have willfully infringed it." Under the seemingly permissible guise of securing for plaintiff "(a) the amount of statutory damages, if any ... and (b) ... the amount of costs and attorneys' fees, if any, ...". (Pre–Trial Memorandum of Plaintiff, filed June 17, 1985, p. 25, hereafter referred to as "PTM") the real purpose of the plaintiff in this action has been to shift the business expense of promoting a motion picture away from its producer (Warner, which made a large profit) and to place it, not on a *willful* infringer, but on a small shopkeeper who committed but a single and innocent infringement.

Thus, the reality is that, while defendants at no time caused any damages whatever to it, Warner has been pressing this litigation for over three years for the purpose of collecting disproportionately large statutory damages and attorneys' fees. The motives for this litigation seem dubious; they have not been necessary to protect any copyright interest of Warner; they have not been necessary to compensate plaintiff for any damages suffered or reasonable expenses incurred; they have not been necessary to deter and penalize defendant, a small and innocent infringer; they seem in context to be "oppressive reasons" and "vexatious" within the meaning of those words in the opinion of the Supreme Court in *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). Moreover, the litigation, unreasonably prolonged, was itself conducted in an unfair, vexatious, and oppressive manner.

There was a joint trial in October 1986 and May 1987 of this action and nine other actions "involving a common question of law or fact" (Fed.R.Civ.P. 42(a)). The same plaintiff brought each of the ten related actions; the defendants in each of the actions were different. The joint trial was directed by order filed October 2, 1986. While the order for a joint trial directed that the ten actions be "consolidated for a joint trial," it is well settled that

> consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.

*Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–497, 53 S.Ct. 721, 727–728, 77 L.Ed. 1331 (1933). See also *Garber v. Randell*, 477 F.2d 711, 715 (2nd Cir.1973). Where several actions are ordered to be tried together "each retains its separate character and requires the entry of a separate judgment." 9 Wright & Miller, Federal Practice and Procedure: Civil § 2382 at 254 (1971).

A separate decision, with findings of fact and conclusions of law, will be filed hereafter in each of the nine other actions tried together with this action.

The principal issue as initially framed by the pleadings was whether there should be a permanent injunction against any infringement by defendants of the *two* copyrights in suit. As will appear, the defend-

ants early offered on November 2, 1984, to consent to a permanent injunction as to *both* copyrights, this despite the fact that plaintiff had no evidence when the action was commenced (and had never had any evidence) of any infringement by defendants of one of the two copyrights claimed in the complaint to have been infringed; this offer by defendants was rejected by plaintiff, even though it gave plaintiff protection from copyright infringement, because it did not promise payment of substantial statutory damages (there were no actual damages) and attorneys' fees. The defendants do not now contest, and have not for a long time contested, a permanent injunction as to one of the copyrights (that as to the Gizmo character), the only copyright as to which plaintiff has ever had any evidence of infringement. The claim as to infringement of one copyright (that as to the Stripe character), as will appear, was withdrawn by plaintiff on June 17, 1985.

There now remain, some three years after plaintiff had been assured of the primary relief it sought, the following issues for decision which plaintiff pressed to trial:

(a) should the court award statutory damages to plaintiff against defendants under 17 U.S.C. § 504(c) and, if so, in what amount?;

(b) should the Court "in its discretion," under 17 U.S.C. § 505, "allow the recovery of full costs" by plaintiff against defendants, including "a reasonable attorney's fee"?; and

(c) should the Court "in its discretion," under 17 U.S.C. § 505, "allow the recovery of full costs" by defendants against plaintiff, including "a reasonable attorney's fee" or make such an allowance under Rule 11 of the Federal Rules of Civil Procedure, or otherwise?

For the reasons hereafter stated, the decision of this Court is

(a) there will be judgment in favor of plaintiff enjoining defendant Dae Rim Trading, Inc. and Yun Yon Cho from infringement of Registered Copyright VAu 54–952 ("Gizmo");

(b) there will be judgment in favor of plaintiff against defendant Dae Rim Trading, Inc. in the sum of $100 as statutory damages for past infringement of Registered Copyright VAu 54–952 ("Gizmo");

(c) no costs are allowed to plaintiff; no attorney's fee is awarded to plaintiff; and

(d) full costs are allowed to defendants Dae Rim Trading, Inc. and Yun Yon Cho against plaintiff Warner; a reasonable attorney's fee is awarded to defendants against plaintiff; no costs are allowed and no attorney's fee is awarded to defendants in defending against the infringement of Registered Copyright VAu 54–952 ("Gizmo") prior to February 20, 1985, when defendants conceded that they had infringed that copyright.

## A. PROCEDURAL STEPS THROUGH COMPLETION OF THE TRIAL

### 1.

The plaintiff in this action is Warner Bros. Inc., ("Warner"), a Delaware corporation, whose principal place of business is on Warner Boulevard in Burbank, California, a suburb of Los Angeles near Hollywood. Warner is a subsidiary of Warner Communications Inc. ("Warner Com."), a very large corporate enterprise, the stock of which is publicly owned and listed on the New York Stock Exchange and on other exchanges. Warner Com. has offices at 75 Rockefeller Plaza in New York City and is reported in Standard and Poor's Register for 1986 to have had revenue in that year of 2.23 billion dollars; Warner Com. and subsidiaries are similarly reported to have 8,000 employees, of whom 3,000 are employed by Warner.

Warner provides entertainment services to the public, including the production and distribution of motion pictures; it is reported also to license feature films for television, to distribute TV specials, to produce phonograph records, and to publish music.

On June 8, 1984, Warner released for public showing a motion picture entitled "Gremlins" which became very popular and successful, with attendant and wide publicity. The "Gremlins" motion picture is aimed primarily at children; it concerns

fanciful characters which Warner, in the complaint, avers (para. 7) "were developed specifically for the film"; the relevant such characters are "Stripe" and "Gizmo." According to the film, Gizmo is a "Mogwai"; the Mogwais are benign and cuddly; Stripe is a "Gremlin"; the Gremlins are evil; under some circumstances, a Mogwai becomes a Gremlin.

Warner obtained and owns a valid copyright in the "Gremlins" motion picture, which copyright has been registered with the Copyright Office, but no claim is made on that copyright (T5–8; "T" references are to pages of the stenographic transcript of the joint trial). Warner obtained and owns valid copyrights in the graphic representations of Stripe and Gizmo, which copyrights were registered for copyright as "artwork" or "pictorial work," being drawn representations of the characters "Stripe" (certificate VAu 54–951, dated December 30, 1983) and "Gizmo" (Certificate VAu 54–952, dated December 30, 1983).

After its release on June 8, 1984, the film was widely promoted nationally by Warner. Warner claims (PTM, p. 3) that in the first 66 days after release, Gremlins had a box office "gross" of about $125,000,000; that by the end of 1984 it had "grossed" more than $142,000,000; that it was the third most successful film released in 1984; that Warner, through another subsidiary of Warner Com., promoted a licensing campaign for Gremlins character merchandise; and that licenses for such Gremlins merchandise generated about $8,400,000 in "revenue" for Warner through May 1985 (PTM, p. 4). It should be noted that Warner expresses the financial success of Gremlins in terms of "gross," "revenue," and the like. The actual profit to Warner has not been given, so far as we have found.

Shortly after the release on June 8, 1984, of the Gremlins motion picture for public showing, Warner received information (in a way not disclosed in the record, so far as we have found) that "a number of shops" (P Brief, p. 7) in New York City may have been offering for sale merchandise believed to infringe the Stripe or Gizmo, or both,

copyrights. In this connection, Warner at some point employed an investigative organization. It appeared that the infringing merchandise included dolls, key chains, puffy stickers (stickers for children to affix to books, toys, clothing, etc.), and the like. Nearly all the small shops selling such merchandise were apparently owned by recently arrived Koreans and were operated as family businesses.

2.

On July 2, 1984, Warner filed in this Court a number of complaints commencing separate civil actions for infringement of its two copyrights, these being the graphic representations of the Stripe and Gizmo characters from the film. It is not certain how many such separate civil actions were then commenced but this action was one of them, as were the other nine actions jointly tried with this action. The commencement of these actions so soon (less than a month) after release of the motion picture was a substantial part of what was much later (July 20, 1987) to be described by counsel for plaintiff (P Brief, p. 3) as "a copyright enforcement program." This "program" appears to have been one of the major aggressive Warner activities referred to in the complaint (para. 10) as "the extensive publicity, merchandising and licensing campaigns associated with Gremlins."

The complaint (not verified nor required to be (Fed.R.Civ.P. 11)) named as defendants Dae Rim Trading, Inc. ("Dae Rim") and "John Doe." Dae Rim was averred to be a New York corporation which conducted "business activities" at 43 West 30th Street [in Manhattan]; the nature of the business activities was not described. The identity of John Doe was said to be "presently unknown" but, on "information and belief" (no grounds therefor were given), was said to be "an agent" of Dae Rim, resident in New York; apparently it was thought that he was *male*. John Doe is mentioned by that fictitious name *once* in the complaint (para. 4); thereafter he was presumably meant to be included as one of the two "defendants" in the charging paragraphs of the complaint.

It is alleged that Warner, through a "licensing agent" (which, since it is another subsidiary of Warner Com. need not be distinguished hereafter from Warner itself), had licensed others to use the copyrighted Stripe and Gizmo character drawings "in the production, marketing and promotion of various products." What these "various products" are is not stated (except that they include dolls).

There is one claim in the complaint. This is there summarized as follows: "Defendants have offered for sale and continue to offer for sale various products bearing the likenesses of Gremlins characters including dolls." It is then averred that defendants had no license from plaintiff, and that the "activities of defendants" were "willful acts of infringement." This "willful" infringement was sought to be restrained on the claim that otherwise there would be "irreparable damage" to plaintiff. This "irreparable" damage was said to be (a) in the first instance to the licensees of Warner "for the manufacture and distribution of Gremlins products and, accordingly, will irreparably damage" Warner itself, and (b) in the reduction of revenues to be derived from the distribution of the motion picture. There is no averment that defendants had *actually sold* any infringing merchandise items. They were said only to have "offered" them for sale. The only item specifically named as having been "offered" for sale was "dolls" (para. 11).

The complaint concluded with a prayer for relief.

This action, and the others commenced at the same time, were assigned in normal course to Judge Sofaer.

### 3.

At 5:30 in the afternoon of the same day (Monday, July 2, 1984) on which the complaint had been filed four hours earlier, Judge Sofaer signed ex parte a six-page "temporary restraining order, seizure and impoundment order and order to show cause for preliminary injunction and accelerated discovery." These orders had been prepared by counsel for Warner and presented by them to Judge Sofaer, along with supporting papers as follows: (a) an affidavit by one of the counsel to Warner, sworn to July 2, 1984, to which was annexed a copy of the complaint; (b) the affirmation of an Assistant Secretary of Warner, dated July 2, 1984; (c) the affidavit of the head of the trademark and copyright licensing division of Warner, sworn to July 2, 1984; (d) the affidavit of Mr. Cullen, an employee of The Stonegate Agency, Inc., the private investigating firm ("Stonegate") employed by Warner, (sworn to July 2, 1984); and (e) the affidavit of Mr. Aglione, head of Stonegate, sworn to July 2, 1984. In all, the ex parte orders and supporting papers, bound together as one group of documents, ran to about fifty pages. There was also submitted to Judge Sofaer a 27–page "Memorandum in Support of Plaintiff's Application for a Temporary Restraining Order, Preliminary Injunction, Seizure and Impoundment Order and Accelerated Pre-trial Discovery."

Fed.R.Civ.P. 65(b) forbids the granting of a temporary restraining order without notice *unless* it "clearly appears from specific facts shown by affidavit or by the verified complaint [the complaint here was *not* verified] that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition." No "specific facts" were shown as to anything Dae Rim or "John Doe" was doing which would cause any immediate injury or any irreparable injury to Warner before the defendants could be heard, and it was admitted in the papers submitted by Warner that no efforts had been made to give any notice to defendants. The *only* "specific facts" about *anything* the defendants may have done is in the affidavit of Robert Cullen, an investigator, who says that on June 27, 1984, at the Dae Rim store on West 30th Street he asked for "Gremlins merchandise" and was sold six "six inch Gremlins dolls" for $15. The dolls bought were not themselves submitted, nor any description, nor any photograph. There was no evidence in the papers—nor was any such evidence at any time later submitted—that the dolls were in any way of inferior quality; it was not explained in the

papers that *all* the dolls bought from Dae Rim were in the likeness of Gizmo, nor that Warner, as it later admitted, had *no* evidence of infringement by defendants of the Stripe copyright.

The orders submitted to Judge Sofaer were signed by him ex parte in the exact form as drafted by counsel for Warner; the spaces left blank for the return date and hour of the order to show cause, the amount of the bond to be posted by Warner, the time within which the orders and supporting papers were to be served on defendants, and the like were filled in by hand, presumably by Judge Sofaer.

The orders submitted ex parte to Judge Sofaer were harsh and drastic to an extreme. With great deference to the well known learning and ability of Judge Sofaer, it must be said that the proposed orders should never have been submitted by counsel nor should they have been signed by a judge of this court; they were unauthorized and in error. Especially mistaken is the order that employees of Stonegate, a private investigating firm employed by Warner, *search* the "business premises" of defendants and "seize forthwith and deliver *to plaintiff's counsel*," (emphasis supplied), among other things, "all copies or colorable imitations" of the two copyrighted works in suit and "all books, records, correspondence and other documents" of defendants which "relate to" such copies, etc. It seems clear that such an order is neither authorized nor constitutional nor, in any event, could it lawfully be made ex parte. Yet the order was signed ex parte on July 2, 1984, and contains these provisions (emphasis supplied):

ORDERED, that (1) the United States Marshal for the Southern District of New York, or one or more of his deputies, *or* (2) The Stonegate Agency, Inc., *a private investigatory firm*, through *one or more* of its employees, be, and they hereby are, directed to (a) *search* defendants' business premises located at 43 West 30th Street, New York, New York 10001, and (b) *seize* forthwith and deliver *to plaintiff's counsel* pending further order of this Court:

(i) all labels, signs, prints, packages, wrappers, receptacles and advertisements in defendants' possession, custody or control bearing any simulation, reproduction, counterfeit, copy or colorable imitation of plaintiff's Registered Copyrights VAu 54–951 and VAu 54–952;

(ii) all simulations, reproductions, counterfeits, copies or colorable imitations of plaintiff's Registered Copyrights VAu 54–951 and VAu 54–952;

(iii) all plates, molds, matrices and other means of making said simulations, reproductions, counterfeits, copies or colorable imitations of plaintiff's Registered Copyrights VAu 54–951 and VAu 54–952; and

(iv) all *books, records, correspondence* and other documents *in defendants'* possession, custody or control which relate to said simulations, reproductions, counterfeits, copies or colorable imitations of plaintiff's Registered Copyrights VAu 54–951 and VAu 54–952, or *may provide information* respecting the *vendors* or *purchasers* of such merchandise; . . . .

4.

On July 3, 1984, Cullen, a Stonegate investigator acting for Warner, served at the Dae Rim store two copies of the summons and complaint, the temporary restraining order, what had euphemistically been entitled by plaintiff's counsel a "seizure and impoundment" order, the order to show cause for a temporary injunction and other relief, and a legal memorandum—a mass of legal papers, formidable even to one learned in law—on Yun Yon Cho "an oriental female approximately 5'0" tall and 40 years of age" who advised Cullen that she was the employee in charge, the owner not being then in New York. (It turned out that Yun Yon Cho is the wife of the owner.) This is recited in the affidavit of service of Cullen (sworn to on July 5, 1984) and filed with the summons on July 6, 1984. Whether any lawyer for Warner was present when service on Yun Yon Cho was made, does not appear. This was a rather aggressive legal move against an

oriental woman, a small shopkeeper, with little understanding of English, with apparently no understanding of United States law in general (much less copyright law in particular) and without a long familiarity with the cultural habits of this country, who was working 12 to 14 hours each day and whose husband was away in California. The most extraordinary aspect of the Warner move was the so-called "seizure and impoundment" order, which (as will later be shown) was clearly an unlawful order procured by Warner to enable its private investigators to search the business premises of defendants, to seize items of merchandise and "books, records, correspondence" relating thereto and to turn over everything seized to counsel for Warner; for what purpose the turnover was to be made was nowhere stated.

At the same time as the voluminous legal papers were served on July 3, 1984, on the "oriental female," an unlawful search of her business premises was made (under the order of Judge Sofaer) by a private investigator for Warner. While no mention of the search was made in the affidavit of service, it had been erroneously directed, as before noted, by Judge Sofaer in the late afternoon of the day before; Cullen was told by Stonegate to serve the papers and "to make the seizures" (T786); Cullen could not remember who was with him when the search and seizure took place, but did remember "that there were teams that conducted various seizures, but then the teams were split" and he could not remember who was on his "team" (T788). When asked at trial who picked out the documents to be seized as relating to the infringing goods, counsel for Warner explained they were the "attorneys for the plaintiff ... in the final analysis" and further that "these seizures are typically done by the attorneys for the plaintiff together with investigators working under their supervision" (T120).

In any event, Warner made an "inventory" of the July 3 seizure at Dae Rim. This shows that no infringing goods were found at Dae Rim, but after a search by Warner of the business records and papers, *many papers and records* were seized by Warner; these included many invoices, a Visa card file and a Rolodex (address wheel) (Dae Rim. Ex. H., T349–350). The "inventory" (Dae Rim Ex. H) is on a photocopied form prepared by Warner and apparently widely and indiscriminately used by Warner, its counsel, and investigators for similar searches and seizures in trademark and copyright cases. The form is signed by Cullen and "for defendant" by Yun Yon Cho, who is elsewhere in the form described as the "person served" and as the "worker employee in charge." The inventory was not filed in this Court, nor any copy given to either defendant. The disposition of the books and papers seized was not shown at trial. In response to my inquiry, counsel for Warner advise that such books and papers were turned over to counsel for Warner, by whom they were copied and the originals returned within five days to Dae Rim.

5.

It is established that on Friday, July 6, 1984, Mr. Dunnegan (one of counsel to Warner), well knowing that the defendants were *not* represented by counsel (T951), went to the Dae Rim store and, without advising Yun Yon Cho that she should consult a lawyer (T474, T951), presented to her a form of "preliminary injunction by consent" with a blank for Judge Sofaer's signature; he asked her to sign the injunction consent document and thereby to consent to its being made by Judge Sofaer. The caption names Dae Rim and "John Doe" as defendants and the consent is to an injunction in substance against the infringement of the Warner Stripe and Gizmo copyrights, elaborated in five legalistic subparagraphs. Relying on the statements of Dunnegan, the consent form was then signed by Yun Yon Cho as "authorized agent" for Dae Rim and also by her individually, the latter signature presumably to serve as an attempted justification for inserting her as a defendant in place of John Doe. The paper was signed by Yun Yon Cho in the two capacities and was acknowledged on July 6 in the Dae Rim store before Mr. Dunnegan as a notary public.

The consent to a preliminary injunction recites that "The parties hereby consent to

the entry of this order." Presumably the use of the word "parties" was further to promote the effort by Warner to make Yun Yon Cho—then unrepresented by any attorney—a party to the action in place of "John Doe." Moreover, the consent was to an injunction against any infringement of *either* of the *two* copyrights in suit; *Warner at the time had no evidence, and had never had any evidence, that Dae Rim or Yun Yon Cho had infringed the Stripe copyright* (T967) or had ever infringed the other copyright (Gizmo) except for the one sale on June 27, 1984, to Warner's own investigator (T967).

In any event, the proposed consent as signed by Yun Yon Cho on July 6 was submitted to Judge Sofaer; the injunction was initialed by him on Wednesday, July 11, and was filed the same day in the Clerk's office.

On July 18, 1984, a Stonegate investigator personally delivered to Yun Yon Cho at the Dae Rim store a copy of the injunction by consent, initialed by Judge Sofaer on July 11, 1984. This is recited in an affidavit of service, sworn to on July 31, 1984, and filed on August 28, 1984. The affidavit now describes Yun Yon Cho as "an oriental female, approximately 39 years of age, 5′4″ tall, 125 lbs., with black hair...." It is not stated what defendants were claimed to have been thereby served. The caption of the affidavit of service named Dae Rim and "John Doe" as defendants. The "preliminary injunction by consent," annexed to the affidavit of service, did not indicate that it had ever been signed or dated by Judge Sofaer; to the contrary, the places for the signature and date by Judge Sofaer were blank. The service would appear to have been a nullity but, in any event, it is undisputed that Dae Rim had *not* committed *any* infringement of *any* copyright of Warner's since the one sale to Cullen on June 27, 1984.

### 6.

On Friday, September 28, 1984, Warner served by mail, according to the affidavit of service by Mr. Dunnegan, sworn to October 1, 1984, "the Offer of Judgment and Notice of Pre–Trial Conference in the above-entitled action on defendants Dae Rim Trading, Inc. and Yun Yon Cho." The "above-entitled action" in its caption *for the first time* showed the defendants as Dae Rim and Yun Yon Cho. "John Doe" has been replaced as a defendant by Yun Yon Cho but this could not *properly* be done without an order of the court (Fed.R. Civ.P. 21) and there had never been any such order. In any event, neither Dae Rim nor Yun Yon Cho has made any objection to the failure to proceed properly. The offer and notice were directed to Dae Rim and to Yun Yon Cho, showing that Warner well knew that they were not then represented by counsel. The notice was that a pretrial conference "has been scheduled" for Friday, October 19, 1984, before Judge Sofaer; that unless defendants were "represented by an attorney, who will appear on your behalf," they are "required to attend" the conference and to serve and file an answer "immediately" unless they either "accept the offer of judgment being served herewith" or "do not object to judgment by default...." The "notice" with affidavit of service was filed on October 9, 1984; the "offer of judgment" *against* defendants in favor of Warner, which was the offer made by Warner, was not filed. Counsel for Warner have supplied a copy of its "offer of judgment" which "hereby offers to let judgment be taken awarding Warner" a permanent injunction against infringement of the two copyrights in suit and $6,000 damages, "with each party to the action to bear its own costs." The offer of judgment by plaintiff Warner was not an authorized procedure; an offer of judgment is permitted to be served by a party "defending against a claim" (Fed.R. Civ.P. 68) but *not* by a party *asserting* a claim, as Warner was then most vigorously doing.

There was no pretrial conference on October 19, 1984, an adjournment to October 26, 1984, having been approved (apparently) by Judge Sofaer.

### 7.

The next move by Warner was on Tuesday, October 23, 1984, when Warner caused notice to be served personally on Yun Yon

Cho of a "motion for default judgment against defendants," returnable before "this Court" on October 26, 1984. The defendants named in the caption are Dae Rim and Yun Yon Cho. The motion is supported by an affidavit of counsel to Warner, sworn to on October 22, and which recites merely that the "defendants were duly served with the summons and complaint," were required to answer, "have failed to do so," and "are in blatant default of their obligation." It was not disclosed in the moving affidavit (as, it seems to me, should have been disclosed) that three days after service of the summons and complaint a Warner attorney had obtained from Yun Yon Cho, an "oriental female" known by him to be unrepresented by counsel, a consent to a preliminary injunction; that a temporary restraining order obtained ex parte and a consent preliminary injunction had been issued by Judge Sofaer and had been obeyed; that *no* infringing goods had been found on the premises when they were searched on July 3, 1984; that no copyright infringements had taken place thereafter; and that the owner of Dae Rim was away from New York. Moreover, the copy of the summons and complaint served on Yun Yon Cho with the notice of motion for a default judgment had as exhibits copies of *trademarks* of Louis *Vuitton* (see Dae Rim Ex. J, T388), the French luggage maker, rather than of *copyrights* of *Warner;* this would have been puzzling even to a lawyer and much more so to a non-lawyer with limited knowledge of the English language and of this country's law. As will appear, the confusion of the Vuitton and Gremlin papers doubtless came about because counsel for Warner also represent Vuitton in many trademark matters but not, so far as I have found, in copyright matters.

The motion of Warner for a default judgment was made returnable on October 26, 1984, and notice thereof, as above related, was served personally by Warner on Yun Yon Cho on October 23, 1984.

### 8.

There is no record in the civil docket of any pretrial conference on October 26, 1984, and no stenographic transcript of any such conference, but apparently one was held. After inquiry by me, counsel for Warner explained in a letter, dated March 10, 1987, as follows:

[O]ur records indicate that the conference originally scheduled for October 19, 1984, was adjourned to October 26, 1984. Although there was no stenographic transcript of the proceedings, I recall that (a) Mr. Razzano and the other counsel entered their appearances in these actions at that time, (b) Mr. Razzano and the other counsel indicated that they would answer the complaint forthwith, (c) Judge Sofaer asked Warner to withdraw its motion for a default judgment, and (d) Warner did so. No written order, however, was entered as a result of the conference.

It thus appears that on or before October 26, 1984, Yun Yon Cho or her husband (returned to New York) had retained counsel—Mr. James L. Killerlane and Curtis, Morris & Safford (Mr. Razzano of that firm leading)—and that the motion of Warner for a default judgment had been withdrawn.

According to an affidavit later filed in the action (sworn to on November 2, 1984), in support of "motion for a protective order" etc., at the pretrial conference before Judge Sofaer on October 26, 1984, Mr. Bainton represented Warner and Mr. Razzano of the Curtis firm represented Dae Rim and Yun Yon Cho and also defendants in other actions. Mr. Bainton declared that "Warner was ready for trial," despite the fact that neither Dae Rim nor Yun Yon Cho had filed an answer to the complaint. Mr. Razzano declared that discovery was necessary before a trial could commence. Apparently the matter was left by Judge Sofaer for discussion between counsel, which took place. Mr. Bainton advised at such discussion that "Warner sought in addition to a permanent injunction only its attorneys' fees, disbursements and statutory damages of $500." Mr. Razzano advised that "extensive discovery would still be necessary." Mr. Bainton asked for a letter explaining what discovery was need-

ed. Under date of October 31, 1984, Mr. Razzano sent such a letter.

9.

On November 2, 1984, Dae Rim and Yun Yon Cho served by hand and filed an answer with two counterclaims and a separate demand for jury trial. One of the two counterclaims was for money damages for enforcement by Warner of an "unlawfully granted" temporary restraining order; as already noted and as will appear, the ex parte temporary restraining order had indeed been granted unlawfully. Defendants appear to have been entitled to a jury trial on any claim by Warner to actual damages, or by them in a counterclaim; there is authority that defendants, even as to statutory damages, had a right to jury trial (Circuit Judge (then District Judge) Newman's decision in *Chappell & Co. Inc. v. Pumpernickel Pub, Inc.*, 79 F.R.D. 528, 529 (D.Conn.1977)). Any jury trial question is, of course now academic; the jury demand was later withdrawn by defendants.

On November 2, 1984, along with their answer, Dae Rim and Yun Yon Cho served on Warner offers of judgment under Fed. R.Civ.P. 68. The offers of judgment were in each case for a permanent injunction substantially as demanded in the complaint. The offer for Dae Rim (but not for Yun Yon Cho) also included consent to a judgment for $250 as statutory damages. Each offer specified that "each party to the action to bear its own costs and attorneys fees."

Fed.R.Civ.P. 68 provides for an "offer of judgment" by any party "defending against a claim." The offer of judgment must include "with costs then accrued," not included in the offer by defendants here. The offers here were not filed, but filing is authorized under Rule 68 only when "the offer is accepted" and the offers here were not accepted by Warner.

It should carefully be noted, however, that Warner, over three years ago, had offers of judgments from the two defendants it had named (eventually) in the caption of its complaint, which judgments would have then given Warner the princi-

pal relief sought in its complaint—a permanent injunction against any infringement of its two copyrights. Warner rejected these offers and for over three years has persistently and aggressively prosecuted this action to secure unwarranted statutory damages, costs and attorneys' fees (the amount claimed greatly increasing with each passing day).

10.

The next move by Warner was for a protective order or alternatively for a bond from the defendants. The protection sought was from discovery to the extent asked by counsel for defendants in the pre-trial conference of October 26, 1984, and thereafter. Notice of motion for such an order was served for Warner on Friday, November 2, 1984, at 7:30 in the evening, according to the affidavit of service. The offices were closed at that hour of the evening and the affidavit recites that the server "was unable to find a person in charge of the offices."

Warner attempted to support its motion by an affidavit, somewhat lacking in candor. The statements in the affidavit would in any event be confusing to the Court and prejudicial to the defendants because (among other things) they incorrectly applied to defendants the epithet "counterfeiters."

The lack of candor lies in the charge in the affidavit, sworn to November 2, 1984, that defendants were infringing Warners "copyrights" (plural) by sale of merchandise depicting "*two* characters" (emphasis supplied) from the Gremlins movie; and by emphasis in the affidavit on the fact that, between July 3, 1984, when defendants were first notified of the commencement of the action, and October 26, 1984, they "did not retain counsel in this action." When this charge was made and the emphasis employed, Warner well knew that defendants had *never* infringed the Stripe copyright, one of the two copyrights on which the complaint was based, and that the *only* infringement of the other copyright by defendants was the $15 sale to a Warner investigator more than four months before. Warner also well knew that, while defend-

754

ants did not retain counsel until October 26, 1984, they had not, since the single infringement on June 27, 1984, further infringed, had consented to a preliminary injunction, and had obeyed such an injunction. These significant facts were *not* disclosed to the Court in the affidavit.

The confusion of the Court and the prejudice to defendants would result from Warner's persistent misuse of the words "counterfeit" and "counterfeiters." They are employed by Warner as synonyms for "infringe" or "infringing" and for "infringers." The words "counterfeit" and "infringe," however, are *not* synonyms; they have an entirely *different* meaning.

The word "counterfeit" does not appear in the copyright law, neither in the Copyright Act of 1909 nor in the presently effective Copyright Act of 1976 (17 U.S.C. § 101 and following).

The word "counterfeit" in the law of trade competition is used frequently in *trademark* law. For example, the trademark law (15 U.S.C. § 1114(1)(a)) provides remedies in a civil action by the owner of a registered trademark against any person who shall

use in commerce any reproduction, *counterfeit*, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; (emphasis supplied)

The word "counterfeit" is defined in the trademark law (15 U.S.C. § 1127) as: "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." The trademark law (15 U.S. C. § 1116(d)(1)(A)) also provides that in a civil action for "using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the court may, upon ex parte application, grant an order for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such

violation." The term "counterfeit mark" is defined in the trademark law (15 U.S.C. § 1116(d)(1)(B)) in relevant part as follows:

a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered;.

 The word "counterfeit" thus is properly used with respect to an item which is sold with a false trademark, because the false trademark is deceptive to the public since it falsely represents that the item was made by the owner of the trademark. There was no such false mark on the dolls sold by Dae Rim to the Warner investigator (PX 1–5). There was no mark of any kind on those dolls; there was nothing to show by whom they were made, or where. As Warner well knew, they had not been made or imported by defendants. There was no name or sign or other false claim that they were made by Warner or any licensee of Warner or had any connection with Warner or with the Gremlins movie. There was no copyright notice on the dolls claimed to infringe, as Warner's witness, Grant, admitted (T66). They may well infringe the Gizmo copyright owned by Warner, but there is not the slightest excuse for describing them as "counterfeit."

There was a meeting on November 1, 1984 between counsel for Warner and counsel for Dae Rim. Settlement was then discussed. According to an undated declaration of counsel for Dae Rim (later filed November 7, 1984) Warner then "sought to receive $85,000.00 as the attorney's fees and private investigator's fees ..." and "demanded $5,000 from each defendant in settlement." Counsel for defendants refused to settle on those terms, explaining in the cited declaration that "defendants are innocent infringers at worst and indeed are all themselves victims of the originator of the accused products."

The motion by Warner for a protective order or bond was submitted on elaborate

moving and opposing papers and memoranda of law. There was apparently no oral argument. By endorsed memorandum and order dated November 7, 1984, Judge Sofaer denied Warner's request for a bond and directed the parties to agree on the scope of discovery or to submit proposed orders so that he could decide their disagreements. The parties did agree and Judge Sofaer on November 20, 1984, "so ordered" their agreed "discovery schedule." There was then a period of relative inactivity by Warner in this action, but at a pre-trial conference on February 20, 1985, not reflected in any docket entry nor in any transcript in the court's file, the defendants in this action, according to counsel for Warner (PTM, p. 25), "conceded that they infringed one or both of the 'Gremlin's' Character Copyrights." This means that as early as November 2, 1984, by the offer of judgment, and confirmed on February 20, 1985, as just shown, Warner knew that defendants in this action did not contest the issue of infringement.

### 11.

On June 17, 1985, counsel for Warner filed a 49 page "pre-trial memorandum of plaintiff" ("PTM") in this action (and in those related). This is said (p. 1) to have been done "in anticipation of the joint trial of the actions." It should be noted that in this document Warner withdrew, for want of any evidence of infringement, any claim in this action based on the copyright of the Stripe character, one of the two copyrights in suit. The statement of Warner was (p. 8): "Warner has no evidence of infringement of the Stripe copyright and so much of its claim as is based on that copyright is withdrawn." Since the Warner claim was that two copyrights had been infringed and since Warner admitted that it had no evidence that one of the copyrights was ever infringed by defendants in this action, it would seem that Warner withdrew at least half the claim alleged in the complaint.

In the "PTM", filed June 17, 1985, Warner also elects to recover "statutory damages." This election is permitted under the Copyright Law (17 U.S.C. 504(c)) which provides that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages...." Warner states in its "pre-trial memorandum" (p. 27): "In this action [presumably Warner means in each of the actions, the file numbers of which are shown in the caption, including that against Dae Rim], Warner hereby elects to recover statutory, rather than actual, damages." The reason for such an election by Warner seems clear. Warner had no evidence to prove *any* actual damages; on the contrary, if there had been any infringing sales or offers to sell Gizmo dolls to the public (as opposed to the evidence of one sale to an investigator for Warner), they would have more likely been of *benefit* to Warner with its target audience of children as contributing to their knowledge of, and attraction to, the Gremlin movie.

The pre-trial memorandum of Warner, filed June 17, 1985, makes it clear that the copyright litigation rhetoric of Warner was not based on any evidence of damage to Warner by the claimed infringement of defendants. On the contrary, according to the memorandum (PTM 2–5), nothing the defendants did caused any actual damage to Warner; in fact, the Gremlins film and merchandise licensing were enormously profitable to Warner.

The defendants were charged with extravagant misconduct: "blatant and ... willful advertising, offering for sale or sale of piratical 'Gremlins' character merchandise" (PTM 1). The word "piratical" is the overblown term used by Warner counsel instead of the correct term "infringing."

The pre-trial memorandum (PTM 2) made it clear, however, that the theory of Warner was not that it should recover as "statutory damages" for actual damages. Warner was asking (PTM 2) for a recovery of "statutory damages in an amount sufficient to deter defendants from future violations." Warner did not contend that the conduct of defendants caused it any damages; on the contrary Warner stated (PTM 2) that from the moment of its release, the Gremlins film "demonstrated immense popularity," the millions in revenues were em-

phasized (PTM 3), the film was "unquestionably among the most successful motion pictures of the 1984 summer season" (PTM 3), merchandise licensees "generated" $7,700,000 "in revenue for Warner" in 1984 and $700,000 through May, 1985 (PTM 4), the "merchandising program also contributed to the promotion and advertising of the motion picture" (PTM 5), and "infringing articles *could have* inflicted incalculable damage on the licensees" of Warner (PTM 5; emphasis supplied; "could have inflicted," not "did in fact inflict").

The "pre-trial memorandum" of Warner (PTM 1) makes clear that the only reason for the prosecution of the litigation by Warner was to recover "the amount of statutory damages, if any," and "the amount of costs and attorneys' fees, if any."

On June 20, 1985, this action (and other related actions) were reassigned to Judge Haight. The cause was doubtless the resignation of Judge Sofaer.

On July 26, 1985, Warner served notice of motion to strike the jury demand of defendants.

On August 7, 1985, the defendants filed a "reply" to the motion to strike their jury demand. The reply was withdrawal of the jury demand. The demands were struck by endorsed order of Judge Haight filed January 29, 1986.

On June 26, 1986, Judge Haight filed a "Scheduling Order for Pre–Trial Memoranda."

On August 5, 1986, the parties to the related actions assigned to Judge Haight filed a "Final Pre–Trial Memorandum."

Under date of September 29, 1986, this action against Dae Rim and Yun Yon Cho was reassigned from Judge Haight to me (the other related actions were reassigned at the same time). These transfers were on the consent of the two judges affected, as provided in Rule 16 of the "Rules for Division of Business" of this Court.

12.

There was a pretrial conference before me on October 1, 1986, of this action (and of the other related but separate actions

then just transferred from Judge Haight). There is a stenographic transcript of that conference; references to its pages are preceded by "PTC" (Pretrial Conference).

It was agreed by counsel for all parties that the trial of the actions was to be to the Court and not to a jury (PTC5–6).

Counsel for Warner attempted a summary explanation to the Court of a proceeding brought by Warner before the International Trade Commission (ITC) "for an order excluding entry into the United States of piratical Gremlins merchandise" (PTC8). The proceeding before the ITC will be described in the section to follow.

As the pretrial conference continued, counsel for Warner made claims as to the volume of infringing merchandise, which claims turned out to have no support in the evidence. Counsel claimed (PTC9) that when "the motion picture was released, there was an avalanche of piratical Gremlins merchandise on the market" and (PTC12) "there was a flood of piratical Gremlins merchandise in the New York metropolitan area."

It appeared that the defendants in this action reaffirmed their concession (made in the November 2, 1984, offer of judgment, and again at the pretrial conference on February 20, 1985) that they infringed the Warner Gizmo copyright but denied that they were liable for statutory damages or attorneys' fees or costs (PTC14).

After discussion at the October 1, 1986, pretrial conference whether there should be a joint trial of the ten actions, the Court made its decision (PTC30) which was embodied in a written order filed October 2, 1986 directing that the ten actions be "consolidated for a joint trial of all issues enumerated in the final pretrial memorandum ... except the quantum of statutory damages, attorneys' fees or costs, if any, that any party may recover against another party."

13.

We digress from this action to describe the related Gremlins litigation by Warner before the ITC.

On July 25, 1984, Warner had extended its copyright enforcement program by filing a complaint with the ITC under Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337). At the same time, Warner moved for temporary relief to exclude imports. The complaint and the motion were based on the claim that there were unfair methods of competition and unfair acts in the importation of products which were depictions of characters from the Gremlins film and which infringed Warner's Stripe and Gizmo copyrights—the same as those here in suit—and the Gremlins film copyright. Warner sought to exclude the imports of claimed infringing items of Gremlins merchandise. Among the parties named as respondents was Dae Rim, which was served by mail with the complaint on August 28, 1984. Dae Rim was not represented. There were hearings, a record was made, Warner was represented, and ITC staff counsel represented ITC.

On December 10, 1984, the Administrative Law Judge (ALJ) filed an Initial Determination (ID) and Order, finding "reason to believe" that there was a violation of 19 U.S.C. § 1337 by the "unauthorized importation into and sale in the United States of certain products with Gremlins character depictions" but denying Warner's motion for temporary relief on the ground that "immediate and substantial harm" had not been shown by Warner. The ALJ explained (ID p. 42):

In order to meet the requirement of immediate and substantial harm, the level of lost sales during the Christmas selling season would have to cause greater injury to the overall merchandise licensing program than necessary to justify permanent relief. The injury would truly have to be irreparable. The evidence adduced on this point that complainant [Warner], in the absence of temporary relief during the Christmas selling season, will be caused immediate and substantial harm is unconvincing.

In his opinion, the ALJ found that the cheap imported items of infringing merchandise, such as the plastic dolls of defendants, were not in competition with the licensees of Warner. He explained this as follows (ID, pp. 21–23; indicated omissions are for brevity):

The "Gremlins" movie is a fantasy that appeals to children. (FF 115–16, 137, 142). The film recorded one of the highest gross ticket sales in 1984 during a relatively limited engagement. (FF 238). The movie was released for commercial distribution in June 1984 and withdrawn from distribution on November 1, 1984 (FF 187–88).

If a child enjoys viewing a film, there is generated a desire to possess a reminder of the film and its characters. This desire for momentoes [so in original] is referred to in the licensing industry as the "souvenir value" of the film. (FF 117–21). There is reason to believe that the licensed products produced to exploit the souvenir value constitute a distinct market for GREMLINS character depictions. (FF 117–21, 134). The licensing of such products, however, has been deliberately limited by complainant's licensing agent in the belief that elimination or severe limitation of such low-priced products would enhance the overall attractiveness and profitability of the licensing program. (FF 134, 249). As a result, very few types of licensed souvenir products are present in the marketplace; they are apparently limited to puffy stickers and a series of picture cards showing scenes from the "Gremlins" film. Further, distribution of the puffy stickers product is limited only to Hallmark stores. (FF 147). These products generally sell at retail for substantially under one dollar.

\* \* \* \* \* \*

In the "souvenir" market, the utilitarian value of the product is distinctly secondary to the child's desire to obtain a depiction of the licensed character. (FF 118). The souvenir market is further characterized by impulse purchasing; that is, a large proportion of the purchases are made when the child sees the item in the store or on the shelf. Few purchases are made by individuals who actually go to a store with the intention of

purchasing such an item. (FF 119–20). Such products have as their primary function the satisfaction of a child's desire to obtain a copy of the copyrighted fantasy characters and can be purchased by children using their own funds. (FF 117–19).

In contrast, the higher priced utilitarian goods are almost always purchased by a parent or adult, in conjunction with a child, with the funds of the adult. Such purchases are made not on impulse; a decision to enter the store is usually deliberately made to obtain the product. . . .

\* \* \* \* \* \*

In accordance with the realities of the market, there is "reason to believe" that "souvenir" licensed products are not in competition with higher priced utilitarian products, which the inclusion of a depiction of a GREMLINS characters provides only an "added-on" fantasy value.

The unauthorized imports are virtually limited to the souvenir market for GREMLINS characters: . . . .

\* \* \* \* \* \*

The lower priced, imported Gizmo dolls appear to belong more to the souvenir than the functional category.

Warner asked ITC to review the order of the ALJ denying its motion for a temporary exclusion order. The ITC, by order issued January 4, 1985, declined to do so on the ground that "Warner failed to prove that the domestic industry would suffer immediate and substantial harm in the absence of such relief" *Warner Bros. v. U.S. Intern. Trade Com'n,* 787 F.2d 562, 563 (Fed.Cir.1986). Warner then appealed to the Court of Appeals for the Federal Circuit which unanimously affirmed the order of the ITC, *Warner,* 787 F.2d 562.

### 14.

The joint trial of certain issues began on October 6, 1986, and continued at sessions on October 8, 9, 17, and 23.

After opening statements for the parties (T11–30), Warner put in its case in chief against the defendants in all ten cases (T30–193), and then rested (T193). The defendants then put in their cases (T197–99, 204–325, 327–714), completing their presentation on October 23. Warner then on October 28 began a case in rebuttal (T716), at the end or near the end of which Warner called Mr. Dunnegan as a witness (T879–80). Mr. Bainton, a partner of the law firm representing Warner at the trial and lead trial counsel for Warner, was preparing to question the witness. Mr. Dunnegan, as an associate in the law firm representing Warner, was active in the preparation of the case for trial, and had acted throughout the trial as an assistant of Mr. Bainton. Counsel for the defendants then raised the point that Mr. Dunnegan could not testify so long as the law firm with which he was associated was acting as trial counsel to Warner—that if Mr. Dunnegan were to testify, then before doing so, Mr. Bainton's law firm must be disqualified. Mr. Razzano, counsel for most of the defendants, asked the Court "to order Mr. Bainton and his firm to withdraw from representation" (T883).

It then developed that the question whether Mr. Dunnegan could testify and also whether counsel for Warner could properly continue their representation were questions which had to be decided before Mr. Dunnegan could properly testify (T887–88). His testimony was therefore deferred (T890). The trial continued as to other matters and at the end of the court day on October 28, 1986, was adjourned without date, to await the decision on the propriety of Mr. Dunnegan testifying (T940).

The parties thereafter submitted memoranda in support of their positions on the motion to disqualify counsel for Warner.

By memorandum opinion and order, filed March 19, 1987, the Court denied the motion to disqualify counsel for Warner, ruling that Mr. Dunnegan might properly be called as a witness by counsel for Warner.

The trial resumed on May 18, 1987. Mr. Dunnegan testified on that day (T946–982). Warner then rested its rebuttal case and the taking of evidence on the issues tried was completed (T982–83).

Thereafter Warner filed in this action on July 21, 1987, its P Brief; already noted; on August 19, 1987, defendants Dae Rim and Yun Yon Cho filed in this action their "Proposed Post–Trial Findings of Fact and Conclusions of Law," hereafter referred to, for convenience, as "D Brief."

## B. MATTERS OF FACT RELEVANT TO THE ISSUES TO BE HERE DECIDED

15.

The copyright litigation pressed by Warner to promote Gremlins may well have had its origin in earlier experiences of Warner counsel in unrelated trademark litigation involving a French luggage manufacturer. At the least, those earlier trademark experiences seem to have affected the methods employed in the Gremlins copyright litigation.

Beginning as early as the first papers submitted to Judge Sofaer on July 2, 1984, counsel for Warner have persistently and extensively cited many decisions in earlier Vuitton trademark cases to justify their contentions and activities in Gremlins copyright litigation. For an example, in this very action, July 2, 1984, in an affidavit submitted to Judge Sofaer in support of an ex parte application for a temporary restraining order and a search and seizure order, counsel for Warner made the following representations, among others:

11. The facts present in *In re Vuitton et Fils S.A.*, 606 F.2d 1 (2d Cir.1979) —a trademark counterfeiting case in which the United States Court of Appeals for the Second Circuit granted plaintiff's mandamus petition to compel the United States District Court for the Southern District of New York to issue an *ex parte* temporary restraining order —are even more compellingly present in this case. During the course of numerous actions which plaintiff's counsel have instituted and hundreds of investigations which counsel have directed on behalf of Louis Vuitton S.A., and other trademark owners, we have concluded that there are numerous, closely knit networks of manufacturers and distributors of counterfeit merchandise. We have also learned that when one member of this community of counterfeiters realizes that he has been identified and is about to be enjoined from continuing his illegal enterprise, he will immediately transfer his inventory to another counterfeit seller, whose identity is unknown to plaintiff.

Vuitton is an old, well-known and established Paris manufacturer of elegant and expensive luggage and kindred items. At some time in 1978 or earlier, Vuitton had been faced by widespread sales in this country of cheap imitations of its expensive luggage. These imitations carried Vuitton's distinctive trademark, falsely representing thereby that the imitation items had been made by Vuitton. By the end of March 1979, Vuitton had brought 84 trademark actions in this country, of which 53 were in this Circuit. Counsel for Warner in the case at bar acted with success for Vuitton in this litigation. In the Vuitton case, referred to in the affidavit quoted above and heard by our Court of Appeals, the Court ordered an ex parte temporary restraining order to issue, emphasizing that "[i]n a *trademark* infringement case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury to satisfy the requirements...." *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4 (2d Cir.1979), (emphasis supplied). The Court further explained at the same place:

Here, we believe that such a likelihood of product confusion exists. The allegedly counterfeit Vuitton merchandise is virtually identical to the genuine items. Indeed, the very purpose of the individuals marketing the cheaper items is to confuse the buying public into believing it is buying the true article.

The latest chapter in the Vuitton trademark story was written on May 26, 1987, when the Supreme Court decided *Young v. U.S. ex rel. Vuitton et Fils,* ___ U.S. ___, 107 S.Ct. 2124, 95 L.Ed.2d 740. Several defendants had been convicted of criminal contempt for violating an injunction against selling products with a "counterfeit" or "colorable imitation" of Vuitton's trademark. At the initiation of the prose-

cution, counsel for Vuitton had applied to this Court for appointment of two of them "as special counsel to prosecute a criminal contempt action for violation of the injunction against infringing Vuitton's trademark" *Young*, 107 S.Ct. at 2129. On the day of the application (March 31, 1983) this Court made the appointment. On appeal after conviction by a jury for criminal contempt, defendants urged that appointing as special prosecutors two private attorneys for Vuitton violated their rights to a "disinterested prosecutor." Our Court of Appeals affirmed *U.S. ex rel. Vuitton et Fils v. Klayminc*, 780 F.2d 179 (2d Cir.1985) rev'd *sub nom. Young v. U.S. ex rel. Vuitton et Fils*, ___ U.S. ___, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Judge Oakes dissented, pointing out that a factor to be considered was "whether the court should approve an ... investigation in which lawyers may have previously violated ethical norms (as it appears, concededly in hindsight, Vuitton's lawyers did here)." *Klayminc*, 780 F.2d at 187. Judge Oakes also pointed out that it was not "available to argue that the chicanery here was performed by an investigative firm rather than by counsel themselves" because "these operations were conducted with [their] knowledge and approval" and "there is some suggestion in the record that the course of conduct by the [investigative firm] was not only ratified by Vuitton's counsel but that it was in part directed by them." *Klayminc*, 780 F.2d at 188. The Supreme Court granted certiorari, 477 U.S. 903, 106 S.Ct. 3270, 91 L.Ed.2d 561 (1986).

The Supreme Court reversed the convictions of the defendants because, in short, "the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety" *Young*, 107 S.Ct. at 2137 (emphasis in original).

The Vuitton trademark litigation is not cited to show that counsel for Warner may have made mistakes there. The Vuitton trademark litigation is cited to show its effect on the attitudes and strategy of Warner, in dissimilar copyright litigation—

among other things, on its aggressive tactics, on its employment of an investigative agency, on the multiplicity of civil actions commenced, on the "sting" operations conducted, and on the transference by Warner of trademark concepts to the very different problems of copyright law, especially since in this copyright case there is no possibility of *product confusion* such as was present in the Vuitton trademark litigation.

The basic law strategy adopted for Warner in this action and in all else related to its copyright enforcement program was to treat trademark and copyright law as the same, to treat the two legal doctrines as interchangeable, to blur the distinction between trademark and copyright, and to cite trademark decisions as equally applicable to copyright issues.

■ The Warner application of trademark concepts in a copyright case was an error of law. There is a great difference between the objective of trademark protection and the objective of copyright protection. The two legal doctrines are distinct, different, and separate.

■ The objective of trademark protection is to protect the maker of goods and the public from confusion as to the origin of goods where confusion is caused by the use of false and counterfeit trademarks. A trademark shows the *origin* of goods. The word "counterfeit" is used in the statutory law of trademarks (15 U.S.C. §§ 1114(1)(a), 1116(d)(1)(A), 1127). To use a false trademark is to misrepresent the origin of goods, to "sail under false colors."

■ The objective of copyright protection is to encourage the creator of an original work in a medium of expression—such as literature, music, art and the like. The encouragement is by giving the creator the exclusive right "to reproduce" the work, "to prepare derivative works", "to distribute copies or phonorecords", "to perform" the work, and "to display" the work (17 U.S.C. § 106). A copyright does not show the *origin* of goods; that is not its purpose. The word "counterfeit" does not appear in the statutory law of copyrights.

16.

The evidence for Warner at trial was very sparse and generally ambiguous. It appears, however, and I find that sometime between June 8, 1982, and December 31, 1982, the Gremlins film was planned in California as a joint enterprise between Warner and Steven Spielberg, an independent film producer in Hollywood, and his company (Amblin) (T36, 38). It was agreed that the licensing of copyrights for merchandise items depicting characters in Gremlins had "great potentials" for money profits (T36) and, reflecting past practice, a merchandise licensing program was developed.

Warner had a group, headed by Joseph Grant, which "was in the business of licensing copyrights and trademarks" (T35), not only those owned by Warner but those owned by clients of Warner such as major league baseball teams, and commercial league hockey and football teams (T36). Grant and his group at Warner worked with Spielberg to develop the merchandise licensing program.

Spielberg was an independent film director and producer, was a "very valued producer," his "name on a film ... has immediate box office cachet," and he "is a valued potential source of film" for Warner (T44). He was the "executive producer" of Gremlins and had "experience with licensing in the film business" (T38). It may be noted that Spielberg is still a major object of public attention for spectacular and successful movies (*Time*, issue of December 7, 1987, p. 79).

It was important to Warner that its relationship with Spielberg be good; "there was a great deal of input from that source" (T44); Warner did anything it could "to enhance" the "relationship and to make him pleased with [Warner's] performance" (T44); again, according to Grant, "being as important a producer as he is, we did pretty much what we were told" (T55).

At about the same time as a merchandise licensing program was developed, a copyright enforcement program was also developed. I find that Spielberg was a dominant voice in copyright enforcement, if not *the* dominant voice. Grant testified that Spielberg was "very concerned ... that infringements be curtailed to the greatest extent possible in order to not hurt the film and also maximize legitimate licensing revenue" (T44); that he "told Warner to enforce the copyrights and to prevent copying and pirating" (T55); that bringing this action and others was "part of the obligation ... undertaken to satisfy Mr. Spielberg's demands" (T55); and that Warner hoped, by bringing this and other actions "to satisfy Mr. Spielberg's demands" (T55). The record indicates that the adoption by Warner of an aggressive enforcement program was in the hope of satisfying Spielberg's demands but was *before* the release of the Gremlins film and *before* it was even known that there would be any success of the new release and any infringements of the Warner copyrights. Warner's program to exploit its copyrights was not for the purpose of avoiding money damage.

The Gremlins film was first released on June 8, 1984, and it, and the capture of further profits by merchandise licenses, were immediately and phenomenally successful. The merchandise licensing program was so successful that "prior to the release of the film, perhaps three months," Spielberg asked Warner "to cease further licensing" because "our licensing efforts had adequately, perhaps more than adequately covered the marketplace to the degree they wished it covered in a licensing sense ..." (T48).

Warner thus, and in large part influenced by Spielberg, commenced and has prosecuted this action (and those related) knowing that Warner had suffered no damage whatever from any infringement of its copyrights.

It was established at trial, that the Gremlins film and the merchandise licensing program were highly successful; further, that whatever were the infringements by defendants in this or in any other action, the acts of these defendants caused no damage to Warner and, if anything, produced benefits. This finding is based on the evidence as a whole, including the testi-

mony of Warner's witness, Grant, as follows:

Q. Do you know if the motion picture "Gremlins" was a success?

A. As a motion picture it was successful, and as a licensing deal it was successful, yes.

MR. RAZZANO: Excuse me, could I have that answer back again? Could you speak up please?

A. I am sorry. As a motion picture it was quite successful, and as a licensing vehicle it was successful. (T39)

\* \* \* \* \* \*

Q. Approximately how much revenue did the Gremlins licensing program generate?

A. In excess of $8 million.

Q. Do you recall approximately what portion of that was generated during 1985 and subsequent thereto?

A. Something in excess of $800,000, as I recall.

THE COURT: $8 million was the total license fees from the time of the beginning of the program to the end of it?

THE WITNESS: Yes, your Honor.

THE COURT: And then you mentioned a figure of $800,000?

THE WITNESS: Counsel asked me, your Honor, about moneys earned in 1985 and thereafter. That is, the year following the release of the film. The greatest portion of that $8 million I noted was earned in concurrent months with the release of the film in 1984.

THE COURT: Something in excess of $7 million in 1984?

THE WITNESS: Yes, your Honor.

THE COURT: And for the rest of the period, $800,000?

THE WITNESS: Yes, sir. (T44–45)

\* \* \* \* \* \*

Q. Do you know of any customer who purchased a product such as these four exhibits that we have just discussed [claimed to be infringements by defendants] instead of purchasing a licensed product?

A. No. (T63)

\* \* \* \* \* \*

Q. Do you know of any harm that was caused to Warner Brothers by any of the defendants whom I represented, the eight Korean retailers in this case, as a result of the sale of these [infringing] products?

A. Specifically, no. (T64)

One of the reasons that the plastic dolls sold by defendants did no damage to Warner is because the evidence shows that the *only* sale by defendants was to a Warner investigator. Another was that, even if there had been many sales of infringing dolls, they could have caused no damage to Warner because such dolls were relatively cheap, they were bought on impulse by children, and could be paid for by money of the children. They were not in competition with any products made by a licensee of Warner. The origin of the dolls meant nothing as an inducement for purchases by children; moreover there is no evidence that any merchandise claimed to infringe was ever misrepresented as made by Warner or by one of its licensees.

17.

■ The involvement of defendant Dae Rim in a single and inconsequential Warner copyright infringement came about on June 27, 1984, shortly after the release of the Gremlins film on June 8, 1984. Warner produced no evidence that this one infringement by Dae Rim was willful. The evidence establishes and I find that the one infringement by defendants was innocent and was not committed "willfully" (17 U.S. C. § 504(c)(2)). In this connection and after study of the record and further reflection, I accept the testimony of defendant Yun Yon Cho and her husband Sung Pil Cho, the owner of defendant Dae Rim, as credible. At one point in Yun Yon Cho's testimony (T487) I described a then impression that she was "evading, arguing, explaining, avoiding." There was later discussion as to this with Mr. Killerlane (T492–94), who pointed out "deep-seated cultural differences" (T492) of the witness, after which I stated that I would "give ... consideration to cultural differences" (T493). Having

done so and having considered her testimony as a whole, I conclude that my limited impression as to a specific point was hasty and inaccurate and affected by her inability to speak English; the testimony of the witness Yun Yon Cho is accepted because, when taken with the other circumstances, it has the ring of truth. Similarly, during the testimony of Sung Pil Cho, I expressed some difficulty in understanding the business practices of Dae Rim personnel in connection with the order and purchase of merchandise from importers, such as H.Bros. (T378). I find, however, that the difficulty was the result of "cultural differences," and of his limited ability to speak English.

Yun Yon Cho was described in Warner affidavits of service as 40 years old and 39 years old. She came to this country in 1978 (T466) and, therefore, whatever education she had was completed before she left Korea. She testified without objection through an interpreter and when asked if she spoke English, replied "Little bit" (T466). My observation was that her English was very poor. In this country, she has worked at Dae Rim 7 days a week for 12 to 14 hours each day. She never saw any movies, never saw the Gremlin film, and was not aware that there was such a film (T470).

In June 1984, between June 8 and June 20, when her husband was away in California, H.Bros., a wholesaler in New York, owned by Chinese, sold and delivered to Dae Rim 12 Gremlins plastic Gizmo dolls for $48, or $4 per unit. Dae Rim had nothing whatever to do with the design, manufacture, or importation of the Gizmo dolls. The invoice (PX2722, T370) shows the transaction; PX2 is one of these dolls. It was the practice for H.Bros. to telephone her about "hot items" meaning "popular" items which sold well, and to bring her samples (T467). The 12 Gizmo dolls were delivered on June 20, 1984 (T467, PX2722). H.Bros. indicated to her that "it came from Taiwan" and "was cleared through the customs offices" (T468, 469), which is entirely consistent with the later refusal of the ITC to exclude the import from abroad of the Gremlins merchandise. The next day, June

21, she paid H.Bros. $55 for items delivered to her on June 20, which included $48 for the 12 Gizmo dolls (T471); the H.Bros. invoice, PX2722, is marked "PAID 6/21". H.Bros. did not tell her they were "from a movie" (T470).

It is stipulated by the parties (Final Pre-Trial Memorandum, dated Aug. 4, 1986, p. 19), that on June 27, 1984, Cullen (of Stonegate) bought six Gizmo dolls from an oriental man named "Kim." This does not refer specifically to Dae Rim but it was shown to do so by affidavit of Cullen, sworn to July 2, 1984, which recites that the purchase was made at Dae Rim on June 27 for $15, or $2.50 per doll, a loss to Dae Rim on the sale to Cullen of $1.50 per doll.

After the six dolls were sold to Cullen, according to the testimony of Yun Yon Cho, someone came to her and told her that the dolls were "from the Gremlin movie." She "immediately" telephoned H.Bros. and "returned them" (T472), by which I take it she means she returned the six unsold Gizmo dolls to H.Bros. She testified (T472) that she told H.Bros.: "I understand this is from the movie Gremlin, I cannot sell this."

There is no evidence that defendants made any profit on the purchase of 12 Gizmo infringing dolls from H.Bros.; on the contrary, the evidence is that there was a loss. They paid $48 for 12 infringing dolls; 6 of these were sold to the Warner investigator for $15 and the other six were returned to H.Bros.

It is stipulated that defendants "did not manufacture, design or solicit the manufacture or design" of any infringing products.

When an unlawful search and seizure was made by Warner of the Dae Rim premises on July 3, 1984, no infringing merchandise was found and no merchandise was seized (Dae Rim Ex.H) (Final Pre-Trial Memorandum, dated Aug. 3, 1986, p. 19).

There is no evidence that defendants knew that the Gizmo character had been copyrighted by Warner, nor had any knowledge of what "copyright" meant, nor that their handling of the Gizmo dolls received from H.Bros. could lead to legal claims for copyright infringement.

There is no evidence that the defendants ever heard of the Gremlins movie or had ever seen any advertisement or other notice of it. There was some evidence that there had been advertising, but no examples of any advertising were offered in evidence. There was no advertising in Korean language newspapers.

As I understand the argument for Warner that the infringement of defendants is shown to have been "willful," it is in three parts.

The first part is that defendants bought 12 infringing dolls from H.Bros. and "thus were necessarily familiar with the unusual way in which it did business" (P Brief, p. 21), namely, as showing that H.Bros. "fully understood that its sale of 'Gremlins' merchandise was unlawful." There is no evidence that Dae Rim had any knowledge as to what H.Bros. understood; the argument is thus without support. Moreover, the knowledge by Warner of infringements by H.Bros. was not acquired until after December 13, 1984, when Dae Rim (and other defendants) answered interrogatories that they had bought infringing dolls from H.Bros. See memorandum for Warner in action 85 Civ. 997, filed 2/21/86, p. 3. The investigators for Warner had been at work in the immediate area for many months on Gremlin infringements but learned nothing about any copyright violations of H.Bros. until the answers of defendants to interrogatories were served.

The second part of Warner's argument is that defendants were sued in 1983 in a *trademark* case involving merchandise with pictures of a "Menudo" singing group (P Brief, p. 24). There is nothing to show what, if anything, defendants did which brought about the action. It appears that there was a consent judgment signed by defendant Dae Rim but no money payment was made (T183, PX2721, T357–58). Since there is nothing to show what, if anything, Dae Rim did and since the matter in any event did *not* involve copyright, the evidence has no tendency to prove a willful copyright infringement here. In this same connection, Warner also asserts that Dae Rim was named as a defendant in an action entitled *Original Appalachian Artworks, Inc. v. Yu Il International Trading Corp.*, 84 Civ. 4962 (PX2669) and that "[t]his experience should have made these defendants sensitive to copyright problems" (P Brief 44). The assertion is meaningless, however, because the complaint in the Appalachian case was not served on Dae Rim until *after* the complaint had been filed in the case at bar; such service on defendant Dae Rim was not until July 13, 1984 subsequent to the commencement of the case at bar (PX2669B).

The third part is that defendants "operate a successful and sophisticated wholesale business" (P Brief, p. 24). I find that this is not an accurate description; there is no evidence that the business of the Dae Rim defendants was "successful" nor that it was "sophisticated," so that defendants can be said to have known that selling the 6 dolls to a Warner investigator was a copyright infringement and was willful. The evidence is that Dae Rim sold to "small retail stores" (T390) meaning "flea market sales people" (T390) and "street peddlers" (T395); the majority of the customers do not speak English (T374).

The burden of proof that the infringement was "committed willfully" is on plaintiff Warner. 17 U.S.C. § 504(c)(2). Warner has not met this burden. On the contrary, the evidence establishes that the defendants have sustained their burden of proof that the infringement was committed innocently; that they were "not aware and had no reason to believe that his or her acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2).

It should also be noted that Warner also argues that defendants "acted willfully" because H.Bros. exchanged telexes with the makers of the infringing dolls in Taiwan (P Brief, p. 43). There is no evidence whatever that defendants ever knew of any such telexes. Even Warner argues from mere speculation: "no doubt H.Bros. transmitted this knowledge to purchasers," H.Bros. "could have verbally advised these purchasers," "the purchasers could have inferred it," (P Brief, p. 43). If the telexes had any value as evidence,

which they do not have, a serious question would be raised as to their use as evidence because, as will shortly be explained, they were obtained by an unauthorized and unconstitutional search and seizure.

### 18.

 The action was commenced by the filing of a complaint on July 2, 1984. The complaint charged the defendants with "willful acts of infringement" (para. 13), charged that defendants had distributed products "depicting the copyrighted Gremlins characters" (plural) (para. 13), and that their activities "if not restrained" will "irreparably damage" Warner and "irreparably reduce the revenue to be derived by plaintiff" (para. 14). The complaint was "signed" by an "attorney of record" and, under Fed.R.Civ.P. 11, this constitutes a certificate by the signer that the signer has read the pleading ..., that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact...." The evidence establishes that the complaint was signed "in violation of this rule" in that plaintiff did not make a "reasonable inquiry," had no evidence that defendants had ever infringed one of the two copyrights charged in the complaint, had no evidence of any damage to Warner ("irreparable" or otherwise) and had no evidence that any restraint of the defendants was required or that there was any danger of violation by them of any copyright of Warner after the one sale to a Warner investigator on June 27, 1984.

Except to recover minimum statutory damages of $100 for the one sale of infringing Gizmo dolls for $15, there seems to have been no reason for the commencement of this action nor for its prosecution to this date.

### 19.

On July 2, 1984, shortly after filing the complaint, counsel for Warner obtained ex parte from Judge Sofaer an extraordinary, unlawful, and unconstitutional order, among other things, directing the private investigators of Warner to search the "business premises" of Dae Rim and to "seize forthwith and deliver to plaintiff's counsel" all "copies or colorable imitations" of the Stripe and Gizmo copyrights and "all books, records, correspondence and other documents in defendants' possession" which relate to such copies, etc. or which "may provide information respecting the vendors or purchasers of such merchandise...."

Of the many questionable moves made by Warner in this unnecessary litigation, one of the most artful was to seek and obtain such an ex parte search and seizure order as was submitted to and signed by Judge Sofaer.

To understand what Warner did in this respect, it is necessary to go back to the fundamentals—the simple first principles—of search and seizure.

 The words of the Fourth Amendment to the Constitution are as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The "business premises" of Dae Rim and the "papers" and "effects" of Dae Rim therein are protected by the Fourth Amendment. This is true whether the search and seizure arises in a civil or in a criminal context. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 311–13, 98 S.Ct. 1816, 1820–21, 56 L.Ed.2d 305 (1978).

The Copyright Act of 1909, 35 Stat. 1075, in Section 25(c) thereof, introduced into copyright law the concept of impounding during the pendency of a copyright action all alleged infringing articles. This was to make certain that such articles would be available for destruction if it were finally determined in the action that the articles did infringe. Section 25 also provided: "Rules and Regulations for practice and procedure under this section shall be prescribed by the Supreme Court of the United States." (see 214 U.S. 533 fn. 2, 535) The

Supreme Court did prescribe such "Rules" etc. by order made June 1, 1909, and printed as an Appendix in 214 U.S. at 533 and following.

Section 25(c) of the 1909 Act has been replaced by Section 503(a) of the Copyright Act of 1976 (17 U.S.C. § 101 and following). This provides that the court in which a copyright action is pending "may order the impounding, on such terms as it may deem reasonable, of all copies or phonorecords claimed" to infringe "and of all plates ..." etc. "by means of which such copies ... may be reproduced." Section 503(b) of the same Title 17 provides that, as part of "a final judgment ... the court may order the destruction ... of all copies ... found" to infringe "and of all plates ..." etc.

■ It must be emphasized that the copyright statutory law does *not* authorize any *search* of any premises, "business" or otherwise; it only authorizes "impounding" of claimed infringing articles in the custody of the Court for eventual destruction if found after trial to infringe. The provision for a "search" was inserted by Warner in the order submitted and, so far as I can find, was never even mentioned in the twenty-seven page supporting memorandum for Judge Sofaer; the order was there described (omitting any use of the word "search") as a "seizure and impoundment order."

■ It must also be emphasized that the copyright statutory law does *not* authorize the "impounding" of (nor any "search" for nor "seizure" of) any "books, records, correspondence, and other documents" as was done in the order obtained by Warner ex parte from Judge Sofaer. The supporting memorandum to Judge Sofaer does mention "records relating to the purchase and sale of this merchandise" (p. 20) and cites some authority. I am unable to find support in these citations for any authority to seize "records" or "papers" but if they do support such seizure, I am in disagreement with the cited authority.

■ The Special Copyright Rules prescribed by the Supreme Court in 1909 are (with some changes) still in effect. (3 M.

Nimmer, Nimmer on Copyright § 14.07 at 14–58 (1987)). They are printed in 17 U.S. C.A., following Section 501 (West 1977), pages 546 et seq. It is disappointing to note that counsel for Warner represented to Judge Sofaer ex parte that, in effect, he should ignore the Supreme Court's Copyright Rules because "it is unclear whether [those Rules] ... are still effective or have been superseded by the general provisions of Section 503." (Memo, July 3, 1984, p. 24 fn. 4) The Copyright Rules have never been rescinded by the Supreme Court except for Rule 2 which, according to the "Notes of Advisory Committee on Rules" (17 U.S.C.A. foll. § 501 at p. 547), "was a special rule of pleading unsupported by any unique justification." The Supreme Court, by order made February 28, 1966 (383 U.S. 1031), did rescind Rule 2 of the Special Copyright Rules, but deliberately left Rules 3–13 in full force and effect. Those Rules are currently printed at 17 U.S.C.A. foll. § 501 at p. 547. It is true that a "Note of the Advisory Committee on Rules" expresses "serious doubts as to the desirability of retaining Copyright Rules 3–13." 17 U.S.C.A. foll. § 501 at p. 548. This is *not*, however, because they "have been superseded by the general provisions of Section 503" as erroneously suggested to Judge Sofaer ex parte by counsel to Warner (Memo, July 3, 1984, p. 24 fn. 4). On the contrary, the "doubts" of the Advisory Committee are expressly stated to be because Copyright Rules 3–13 "... appear to be out of keeping with the general attitude of the Federal Rules of Civil Procedure ... toward remedies anticipating decision on the merits, and objectionable for their *failure to require notice* or ..." (17 U.S.C.A. foll. § 501 at p. 548; emphasis supplied).

The Special Copyright Rules have a carefully laid out plan for a precise method to enforce the statutory remedy of "impounding." This plan and method bears no resemblance whatever to the scheme suggested in the order submitted to Judge Sofaer by Warner.

The first step under Rule 3 required Warner to file with the Clerk an affidavit stating "the number and location ... of the

alleged infringing copies ... and the value of the same" and to file with the Clerk a bond. This was not done.

The second step is under Rule 4 which directs that the Clerk, upon the filing of the affidavit and bond and approval of the bond, "shall issue a writ directed to the marshal of the district where the said infringing copies ... shall be stated in said affidavit to be located ... to forthwith seize and hold the same subject to the order of the court ..." (17 U.S.C.A. foll. § 501 at p. 549). In view of the present wording of 17 U.S.C. § 503(a)—"the court may order the impounding" etc.—an order of the court would seem to be required before the Clerk could properly issue a writ of seizure for impoundment. The Clerk in any event issued no writ. There was simply the ex parte order of Judge Sofaer.

The third step is under Rule 5 and commands that the marshal "shall seize said articles ... and serve on the defendant a copy of the affidavit, writ, and bond ... and shall make immediate return of such seizure, or attempted seizure, to the court" (17 U.S.C.A. foll. § 501 at p. 550). This was ignored by Warner.

The fourth step is under Rule 6 and commands the marshal to "retain ... in his possession" the alleged infringing articles "keeping them in a secure place, subject to the order of the court." (17 U.S.C.A. foll. § 501 at p. 551). This was ignored by Warner.

Warner entirely disregarded the copyright law and the Supreme Court Rules. Warner, by failing to mention to Judge Sofaer the applicable law and the Rules, secured from him an order which violated the Supreme Court Rules, the copyright law, and the Constitution. There was no authority for any "search" for anything. There was no authority for any seizure by anyone other than a United States Marshal. There was no authority for any seizure by a private investigator. There was no authority for anyone to seize "all books, records, correspondence and other documents in defendants' possession ...," as Judge Sofaer was persuaded to order.

There was no authority for any delivery of what was seized "to plaintiff's counsel," as Judge Sofaer was persuaded to order.

20.

There was only *one* order signed ex parte by Judge Sofaer on July 2, 1984, but this one order contained seven separate ordering sections dealing with separate matters. The document, prepared by counsel for Warner, was described in its caption as "Temporary Restraining Order, Seizure and Impoundment Order and Order to Show Cause for Preliminary Injunction and Accelerated Discovery."

The first ordering section of the document, signed and dated on July 2, 1984, and filed on July 3, 1984, directed defendants Dae Rim and "John Doe" to show cause before the Court on July 11, 1984, why preliminary injunctive relief should not be granted to Warner.

On Friday, July 6, 1984, Mr. Dunnegan, of counsel to Warner, went to the Dae Rim shop and presented to Yun Yon Cho a "preliminary injunction by consent" with a request that she sign it. She did so, signing it twice, once as "authorized agent" for Dae Rim and once individually. She then acknowledged her two signatures before Mr. Dunnegan as a Notary Public. The "Preliminary Injunction By Consent" was signed (initialed) by Judge Sofaer on July 11, 1984, and on the same date, was filed. It enjoins defendants in substance, preliminary to trial, from any infringement of the two Warner copyrights of the Stripe and Gizmo character representations.

According to the affidavit of service, filed by Warner on August 28, 1984, the preliminary injunction by consent was served on Yun Yon Cho on July 18, 1984 and, as served on her, did not show that the document had been signed by Judge Sofaer nor that it had been dated. The service would thus seem, therefore, to have been a nullity (unless the affidavit of service had a mistaken omission in the copy said to have been served); there is no evidence, however, that the defendants ever infringed either of the two copyrights initially in suit after the one sale on June 27, 1984, to the Warner investigator.

It was this incident of the obtaining by Mr. Dunnegan of the consent of Yun Yon Cho to the preliminary injunction which led to his being called as a rebuttal witness by Warner and resulted in the motion to disqualify present counsel for Warner, all as earlier described. The motion to disqualify was denied and Mr. Dunnegan testified.

Yun Yon Cho testified (through an interpreter) that a few days after the search and after the seizure of books and papers at her shop, a man, stipulated to have been Mr. Dunnegan (T473), came to her shop and asked her to sign a paper; this was a consent to a preliminary injunction (T473–474; Dae Rim Ex. I). She told him her husband was not there and she could not sign; he told her that since she was "the wife," her "signature would take care of it" and she then signed (T474). Mr. Dunnegan did not explain what the paper was, or tell her that she should obtain a lawyer; he told her "if I signed there is no problem" (T474). She asked if she could wait to sign the paper until her husband came home but he replied: "You can sign because there is no problem with this" (T475). She was not told by Mr. Dunnegan that if she signed she would still have to hire a lawyer, nor was she told that she would still have to come back to Court at a later date (T475).

Mr. Dunnegan testified on May 18, 1987 —some three years after the incident he was describing. He did not testify to any conversation on July 6, 1984, with any specific person acting for any specific defendant. He testified in general as to what he told an unspecified group of defendants, presumably those in the ten cases assigned to me and on trial and to whom he must have spoken separately (T946–53).

On cross-examination, Mr. Dunnegan admitted that he knew that the defendants were not represented by counsel (T954) and that he did not tell them that after they had signed the consent to a preliminary injunction they would still have to appear in court at a later date (T955). He testified that the only advantage to a defendant from signing the consent which he was requesting was that "they weren't faced with the immediate prospect of paying a lot

of money to an attorney" (T956). As to whether he advised Yun Yon Cho that she should retain an attorney, the testimony was equivocal, because, among other reasons, of his election to treat the defendants in all the actions on trial as a group; he did not testify to any conversation with any one of them. Mr. Dunnegan did not contradict the testimony of Yun Yon Cho that he did not tell her she should retain a lawyer (T474).

I do not feel that Mr. Dunnegan consciously testified falsely. I do find from his testimony, the testimony of Yun Yon Cho, and the evidence as a whole that Mr. Dunnegan knew that Dae Rim and Yun Yon Cho were not represented by counsel, that he did not advise them to retain counsel, and that his obtaining the consent of Yun Yon Cho to a preliminary injunction was under the circumstances of doubtful fairness. In this connection, I have in mind Rule 4.3 of the American Bar Association Model Rules of Professional Conduct, which deals with transactions between a lawyer and an adversary lay party, not represented by an attorney. Whether Mr. Dunnegan was in violation of this Rule is doubtful. Mr. Dunnegan, an attorney, was in effect telling a layman that she would be better off signing the consent since she would then not have to consult a lawyer immediately and would not have to appear in Court on the July 11, 1984, return date. This appears, however, at the least to be questionable treatment by a lawyer of an adversary party, known to him not to be then represented by counsel.

### C. MATTERS OF LAW RELEVANT TO THE ISSUES TO BE HERE DECIDED

 As has been seen, the trial did not concern itself with any issue of infringement of the two copyrights charged in the one claim for relief in the complaint. That part of the one claim based on the Stripe copyright was withdrawn in writing by plaintiff on June 17, 1985. This left remaining that part of the claim for infringement based on the Gizmo copyright, as to which defendants had first made an offer of judgment (Dae Rim Ex. F) served on

November 2, 1984, then conceded infringement in a pretrial conference on February 20, 1985 (PTM, p. 25), and again in a pretrial conference on October 1, 1986 (Tr.17). Defendants will therefore be permanently enjoined (on their consent) from any infringement of Warner's Gizmo copyright.

The issues at trial were whether the infringement by defendants of the Gizmo copyright was "willful"; whether Warner is entitled to statutory damages and, if so, how much; whether Warner should receive costs including a reasonable attorney's fee; and whether defendants should receive costs, including a reasonable attorney's fee. It was the attitude of plaintiff which prolonged the litigation over the matter of statutory damages and attorneys' fees.

### 21.

An infringer of copyright is liable for "actual damages" or, at the election of the copyright owner, for "statutory damages." 17 U.S.C. § 504. Warner, as earlier explained, has elected in writing to recover statutory damages. Warner asks (PTM, p. 30) for $10,000 in statutory damages against Dae Rim, not shown in the evidence to have made a penny's profit from its one petty infringement.

■■■■ While a plaintiff is allowed to opt for statutory damages in lieu of actual damages, this option is not intended to provide the plaintiff with a windfall recovery. The court has broad discretion to award statutory damages in an amount which will further the objectives of the Copyright Act, namely, to compensate copyright owners for a past infringement and to deter future infringement. *Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651 (2d Cir.1978). Consequently, the amount of a statutory damage award should bear some relationship to the circumstances of the infringement. Generally, in determining an appropriate award courts have considered:

> the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of the defendants' conduct, and the infringers' state of

mind—whether wilful, knowing or merely innocent.

*Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 914 (D.Conn.1980) citing *L & L White Metal Casting Corp. v. Cornell Metal Spec. Corp.*, 353 F.Supp. 1170, 1176 (E.D.N.Y.1972). The demand for a large statutory damage award in light of these factors seems unreasonable, especially since Warner made no attempt to show any actual damage from the one infringement here.

■■■■ The evidence is that Dae Rim on June 27, 1984, sold to a Warner investigator six dolls which infringed the Warner Gizmo copyright. The sale was by an oriental man named Kim, apparently an employee of Dae Rim. This was at a time when the husband of defendant Yun Yon Cho was in California; according to Warner (P Brief, p. 23) he was "the owner of defendant Dae Rim ....". There are two defendants in this action, Dae Rim and Yun Yon Cho. Where two or more persons join in or contribute to a single infringement, they are all jointly and severally liable but "in such circumstances in a single infringement action there is but a single set of statutory damages" 3 M. Nimmer, *supra*, § 14.04[E] at 14–42.4–43; "the Copyright Act allows only a single recovery for a single sale." *Screen Gems–Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir.1972).

■■■■ It would thus appear that a single award of statutory damages should be made against Dae Rim, but not against Yun Yon Cho. Warner has proceeded on this theory and, as just noted, asks for an award of statutory damages of $10,000 against Dae Rim only (PTM, p. 30).

■■■■ The Copyright Law provides (17 U.S.C. § 504(c)(2)) that "where the infringer sustains the burden of proving, and the Court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement ..." the court in its discretion may reduce the amount of statutory damages to "not less than $100." I find that defendants have sustained their burden and have proved that neither Dae Rim nor Yun Yon

Cho were aware, nor had any reason to believe, that their respective acts constituted an infringement. Therefore, in the exercise of discretion, the amount of statutory damages is reduced to $100. In so doing, note is taken of the small size of the Dae Rim business, the relatively small amounts involved, the large revenues and resources of Warner, the substantial profits made by Warner from its licensing of the copyrights, as well as from the film itself, the good faith of defendants in defending the litigation, and their early consent to reasonable relief for plaintiff.

The statutory damages are fixed at $100, which sum Warner may recover against Dae Rim. It is true that there was an order filed October 2, 1986, which excluded from the issues first to be tried "the quantum of statutory damages." But, in view of the full development of the facts at the trial and the resultant ability to find that the defendants were not aware and had no reason to believe that their acts constituted infringement, no further trial is necessary to determine the amount of statutory damages and the Court itself may, and does, herewith fix statutory damages as the sum of $100 in favor of Warner against Dae Rim.

### 22.

Warner asks for the award to it of full costs and a reasonable attorney's fee. (P Brief, pp. 50–58) Warner states that as of April 30, 1985, its costs and attorneys' fees (in all the actions jointly tried) were "over $166,000." (PTM, p. 46)

The Court, under the statutory copyright law (17 U.S.C. § 505), has authority "in its discretion" to allow recovery of "full costs" by or against any party and also to "award a reasonable attorney's fee to the prevailing party as part of the costs."

Since the enactment of the Copyright Act of 1976, whether to allow "full costs" and an attorney's fee has been a matter for the *discretion* of the Court but an attorney's fee can *only* be awarded in the Court's discretion to "the prevailing party." 3 M. Nimmer, *supra*, § 14.09 at 14–65.

The public policy behind the allowance of attorneys' fees to "the prevailing party" has been described by our Court of Appeals: "Such an award assures equal access to courts, provides an economic incentive to challenge infringements, and penalizes the losing party" *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983). The large size and financial resources of Warner, while by no means controlling, do have relevance to the exercise of discretion to award attorneys' fees, this because Warner needs no such public policy encouragement. I understand "equal access to courts" to refer to encouragement to persons of small means to challenge infringements. In connection with the "economic incentive" an award of attorney's fees is intended to provide, this "incentive" is not meant to guarantee reimbursement to a copyright holder who chooses to mount an "enforcement" program to promote a business venture. Likewise, the punitive aspect of such an award is not served when a heavy penalty is levied on an innocent infringer.

While a discretionary award of attorneys' fees to plaintiff Warner would not achieve any public policy goals, the initial obstacle to any award of attorneys' fees to Warner is that it is *not* "the prevailing party" in the action.

There is no definition in statutory copyright law of "the prevailing party." My conclusion from study of the decisions is that it depends on the facts of each civil action. The most useful definition seems to be that in Black's Law Dictionary 1069 (5th ed. 1979):

the party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue even though not necessarily to the extent of his original contention.

The issues originally framed by the pleadings here are not at all the controlling issues which were the subject of trial. When the pleadings were closed on November 2, 1984, the defendants were charged with infringement of *two* Warner copyrights, which was denied in the answer, and defendants asserted two counterclaims, one for a declaratory judgment that

the copyrights of plaintiff are invalid or not infringed (a counterclaim abandoned by defendants after brief discovery) and one for the enforcement by plaintiff of an "unlawfully granted Temporary Restraining Order" (a counterclaim on which defendants here are clearly "the prevailing party"); it has been ruled that the temporary restraining order was unlawful; no damages attributable to it were proved but the obtaining of such an order should be considered as part of the inequitable conduct of Warner.

Long before there was any trial, the "main issue" had ceased to be any issue of the validity of Warner's copyrights, or of their infringement. The "main issue," as Warner itself contends (calling it the "basic issue"), was "who should bear the reasonable expenses [costs and attorneys' fees] of a copyright enforcement program [the many civil actions and the harassing tactics therein employed]—the copyright owner which has had its intellectual property infringed or the persons who have willfully infringed it" (P Brief, pp. 3–4). On this "basic issue," which requires consideration of the claims of Warner (a) for statutory damages, (b) that the infringement of defendants was "willful," and (c) for "full costs," it is the defendants who are "the prevailing party" and *not* the plaintiff Warner. Additionally, defendants have prevailed on their counterclaim for the enforcement of an unlawfully granted Temporary Restraining Order. Clearly, defendants have prevailed "as to the substantial part of the litigation." *Best Medium Publishing Co. v. National Insider Inc.*, 385 F.2d 384, 386 (7th Cir.1967). To conclude that Warner was "the prevailing party" only because it will secure a permanent injunction *on consent* as to *one* copyright and will secure minimum statutory damages of $100, would be "too wooden a view," against which Judge Friendly warned in *Scientific Holding Co. v. Plessey, Inc.*, 510 F.2d 15, 28 (2d Cir.1974), where the Court was considering who was "the prevailing party" under Fed.R.Civ.P. 54(d).

There is thus no authority to award attorneys' fees to Warner because Warner is *not* "the prevailing party."

Assuming, however, that Warner were "the prevailing party," then the discretion of the Court should be exercised to deny any attorneys' fees to Warner. In this circuit, "[t]he provision authorizing attorneys' fees 'has been sparingly used and the amounts awarded modest.'" *Roth v. Pritikin*, 787 F.2d 54, 57 (2d Cir.1986) quoting *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 122 (2d Cir.1962).

The factors which should lead to a discretionary denial of attorneys' fees to Warner, even if Warner were "the prevailing party," are these:

(a) Warner has made large profits from the Gremlins film and its copyright merchandise licensing; a sound public policy would suggest that Warner should be required to charge the expense of a "copyright enforcement program," aggressively pursued to increase the profits of Warner from the Gremlins enterprise, as a cost of that enterprise and not be permitted to shift such expense to innocent infringers who had no profit from their acts;

(b) there is no reason to punish defendants by an award to the copyright owner of attorneys' fees because the infringement in this case was not willful but innocent (*Dolori Fabrics, Inc. v. The Limited, Inc.*, 662 F.Supp. 1347, 1357–58 (S.D.N.Y.1987); Lumbard, C.J. sitting by designation);

(c) the case at bar was commenced without "reasonable inquiry" to determine if it were "well grounded in fact" (among other things, whether there was any infringement of the Stripe copyright and whether any infringement was "willful") and thus was in violation of Fed.R. Civ.P. 11;

(d) there was no evidence that any act of defendants caused any damages whatever to Warner;

(e) the case at bar was continued to be pressed long after Warner could have secured by consent of defendants prompt relief against infringement, but instead

elected to press the action in the hope of securing large statutory damages and attorneys' fees, unjustified as compensation to plaintiff or as any "punishment" for any "crime" of defendants, who in fact had caused no damage to Warner;

(f) at the commencement of the action and without a proper disclosure to the Court, Warner obtained a series of ex parte orders which were illegal, erroneous, unauthorized, and unconstitutional; these directed a search of and seizure at the premises of defendant Dae Rim of alleged infringing articles and of business books and papers; the search and seizure were directed to be carried out by private investigators; the items and papers searched for and seized by "private eyes" were given over to counsel for Warner, who had directed the unlawful search;

(g) Warner repeatedly treated copyright and trademark law as interchangeable, blurring the distinctions between these two separate legal doctrines and causing confusion to the Court and prejudice to defendants;

(h) there was no evidence of any infringement by defendants after the one sale to a Warner investigator before the commencement of the action and before any knowledge of the copyright by defendants;

(i) no infringing items were found on the premises of Dae Rim during the unlawful search on July 3, 1984;

(j) Warner moved for judgment by default against Dae Rim for failure to answer, but without advising the Court that Dae Rim had consented to a preliminary injunction, that this injunction had been obeyed, or that the owner of Dae Rim was away from New York;

(k) on November 2, 1984, a reasonable offer of judgment was made by Dae Rim and refused by Warner because, among other things, it did not meet a demand by Warner for $85,000 as the aggregate of its counsel fees in all its then actions (undated declaration of counsel for Dae Rim filed November 7, 1984);

(*l*) on July 3, 1984, an attorney for Warner obtained a consent to a prelimi-

nary injunction from the Korean wife of the owner of Dae Rim, knowing that she was not represented by an attorney and without advising her that she should consult an attorney; this was of questionable fairness;

(m) Warner has conducted this action for "oppressive" and other "improper" reasons, and has been "vexatious"; and, for all of the foregoing,

(n) it would be inequitable to award any attorneys' fees to Warner.

### 23.

■ The defendants in this action take the position that they are "the prevailing party on the Stripe copyright infringement claim" and as such ask for "their attorneys fees" (D Brief, p. 66, see also pp. 54–66). Defendants concede (D Brief, p. 55) that Warner is "the prevailing party" on the "copyright claim relating to the Gizmo copyright."

■ As I understand the copyright law, there is only one "prevailing party" on any one claim for relief in an action. There was only one claim for relief in the complaint in the case at bar when the complaint was filed and the complaint contained only one count (Fed.R.Civ.P. 8(a), 10(b)). Therefore, I cannot accept the position of counsel for defendants that Warner is "the prevailing party" on the Gizmo copyright and that defendants are "the prevailing party" on the Stripe copyright. I conclude that on the one claim in the complaint as filed, defendants are "the prevailing party," since they prevailed "as to the substantial part of the litigation." *Best Medium Pub. Co. v. National Insider, Inc.*, 385 F.2d 384 at 386.

The claim in the complaint, to the extent that it was based on the Stripe copyright, was withdrawn by plaintiff in writing on June 17, 1985.

There was no trial nor any controversy over the Gizmo copyright; the defendants conceded their liability as to this and while plaintiff will obtain a judgment of infringement of the one copyright, this has not for some time been contested by defendants

and a judgment by consent does not make plaintiff "the prevailing party." However, no costs will be allowed and no attorney's fee awarded to defendants in defending against the Gizmo copyright prior to February 20, 1985 when defendants conceded that they had infringed that copyright.

The matters controverted by defendants were: the amount of statutory damages for infringement of the Gizmo copyright, whether the infringement was willful or innocent, whether Warner should be awarded its full costs including a reasonable attorney's fee, and whether defendants should be awarded their full costs including a reasonable attorney's fee. The decision on each of these controverted matters is in favor of defendants, who are "the prevailing party" in the action because, leaving aside "the prevailing party" issue, they prevailed on the main and only controverted issues.

As "the prevailing party," the defendants may be awarded their reasonable attorneys' fees in the discretion of the Court.

This circuit has held that "[t]he determination of whether a prevailing party is entitled to an award of attorneys' fees depends, in part, upon whether the plaintiff or defendant prevails." *Roth*, 787 F.2d at 57. While generally, fees are awarded to a *plaintiff* who prevails, this in part to redress the wrong and to penalize the infringer, *Diamond v. American Law Pub. Corp.*, 745 F.2d 142, 148 (2d Cir.1984), fees are awarded "circumspectly" to prevailing defendants since such awards would not further these remedial and penal purposes. *Roth*, 787 F.2d at 57. Thus, prevailing defendants are awarded attorney's fees when the "court finds plaintiff's suit to have been baseless, frivolous, unreasonable, or brought in bad faith." *Grosset & Dunlap v. Gulf & Western Corp.*, 534 F.Supp. 606, 610 (S.D.N.Y.1982); *Roth*, 787 F.2d at 57.

The present litigation is similar to that considered by our Court of Appeals in *Mailer v. R.K.O. Teleradio Pictures, Inc.*, 332 F.2d 747 (2d Cir.1964), where a prevailing defendant was awarded attorneys' fees. Judge Kaufman noted that the district court had found plaintiff's claim to be neither "synthetic" nor "capricious" but "unreasonable." The plaintiff,

'had a legal argument. Whether he had an argument which was good as a matter of conscience is open to more doubt ... this was not a case of piracy ... or unqualified refusal, to recognize the validity of a copyright', but rather represented an attempt by Mailer to employ a highly technical argument as a means of extracting a grossly unfair penalty assessment from the defendants.... *This sort of litigiousness cannot be condoned.*

*Mailer*, 332 F.2d at 749 (emphasis supplied) (quote from district court opinion presumably unpublished after hearing on amount of attorneys' fees).

"[C]onsidering the context of the entire litigation," as directed in *Roth*, 787 F.2d at 57, this Court finds that the claim of Warner was unreasonable and that Warner continued to litigate after it clearly became unreasonable. I have not found and do not find that Warner acted in bad faith. I have found, and do find, that the conduct of Warner was "vexatious," was for "oppressive reasons," and was "unreasonable." These findings are made on the basis of the facts and conclusions already set forth in this overlong opinion.

The Supreme Court has dealt with this same problem in the context of an action under Title VII of the Civil Rights Act of 1964, in which there is a provision for an award of an attorney's fee similar to that in the copyright law. In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978), the Supreme Court, approving a decision of the Fourth Circuit Court of Appeals, discussed the standards to be considered in awarding attorneys' fees to a "prevailing defendant." The Court declared that "the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him." The Supreme Court also declared:

a plaintiff should not be assessed his opponent's attorneys' fees *unless* a court finds that his claim was frivolous, unrea-

**774**

sonable, or groundless or that the plaintiff continued to litigate after it clearly became so.

*Christiansburg,* 434 U.S. at 422, 98 S.Ct. at 700 (emphasis supplied).

It may be noted that defendants ask (D Brief, pp. 60–63, paras. 133–138) for an award of attorneys' fees as a sanction for violation by Warner of Fed.R.Civ.P. 11. Since attorneys' fees are being awarded to defendants under 17 U.S.C. § 505, we need not stop to determine that, as seems likely, they should also be awarded under Fed.R. Civ.P. 11.

\* \* \*

There will be judgment in favor of plaintiff Warner enjoining defendants Dae Rim and Yun Yon Cho from infringement of Warner's Registered Copyright VAu 54–952 ("Gizmo").

There will be judgment in favor of plaintiff Warner against defendant Dae Rim in the sum of $100 as statutory damages for past infringement of Warner's Registered Copyright VAu 54–952 ("Gizmo").

No costs are allowed to plaintiff Warner. No attorney's fee is awarded to plaintiff Warner.

Full costs are allowed to defendants Dae Rim and Yun Yon Cho against plaintiff Warner. A reasonable attorney's fee is awarded to defendants Dae Rim and Yun Yon Cho against plaintiff Warner. No costs are allowed and no attorney's fee is awarded to defendants in defending against the infringement of Warner's Registered Copyright VAu 54–952 ("Gizmo") prior to February 20, 1985, when defendants conceded that they had infringed that copyright.

Counsel are requested to attempt to agree on the form of the judgment to be entered herein and if agreement be possible to submit the agreed form of judgment not later than the close of business on Tuesday, February 16, 1988. If agreement cannot be reached, separate proposed judgments are directed to be submitted not later than the same date and time.

Counsel are also requested to attempt to agree on the amount of a reasonable attorney's fee to be awarded to defendants Dae Rim and Yun Yon Cho and to advise the Court by the date and time fixed whether such an agreement can be made. If no such agreement can be made, the matter of the determination of the amount of the attorney's fee to defendants will, in the judgment to be entered herein, be referred to a Magistrate.